UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

v.

PAUL PARMAR,
PAVANDEEP BAKHSHI

Hon. Madeline Cox Arleo

Crim. No. 18-735 (MCA)

OMNIBUS BRIEF OF THE UNITED STATES IN OPPOSITION TO
DEFENDANTS' PRETRIAL MOTIONS

RACHAEL A. HONIG
Acting United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Brief:
NICHOLAS P. GRIPPO
HEATHER SUCHORSKY
SARAH DEVLIN
Assistant United States Attorneys

LESLIE E. LEHNERT
Trial Attorney
Money Laundering & Asset Recovery Section
Department of Justice

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ................................. 6

    A.    Background of the Go-Private Transaction......................................... 6

    B.    Overview of the Defendants' Fraudulent Tactics ............................. 8

    C.    The Criminal Prosecution .................................................................. 13

    D.    Discovery Productions....................................................................... 14

ARGUMENT ...................................................................................................... 16

I.    THE COURT SHOULD DENY BAKHSHI'S SEVRANCE MOTION......... 16

    A.    Legal Standard Under Rule 14......................................................... 17

    B.    Bakhshi's Manufactured Claims of Prejudice Do Not Require Severance Under Rule 14 and Ignore Clear Alternative Solutions. 21

        1.    Defendant's *Bruton* Claim....................................................... 21

        2.    Defendant-Initiated Agreement............................................... 35

II.    THE COURT SHOULD DENY BAKHSHI'S MOTION TO DISMISS THE SUBSTANTIVE SECURITIES FRAUD COUNT BECAUSE THE INDICTMENT ALLEGES THE ELEMENTS OF THE OFFENSE AND COMPLIES WITH RULE 7......................................................................... 41

    A.    Applicable Legal Standards.............................................................. 42

    B.    Count Two Sufficiently Alleges Securities Fraud............................ 43

    C.    Bakhshi Also Can Be Convicted of Securities Fraud Based on Accomplice Liability or Under the *Pinkerton* Doctrine. .................. 48

    D.    The Indictment Sufficiently Alleges a Domestic Securities Transaction....................................................................................... 49

III.    THE COURT SHOULD DENY BAKHSHI'S MOTION FOR A BILL OF PARTICULARS BECAUSE THE DETAILED INDICTMENT AND FULSOME DISCOVERY PROVIDE MORE THAN ENOUGH

INFORMATION FOR BAKHSHI TO PREPARE HIS DEFENSE AND AVOID UNFAIR SURPRISE. ...................................................... 52

    A.    Applicable Legal Standards. .............................................. 53

    B.    Bakhshi is Not Entitled to a Bill of Particulars. .............................. 55

IV.    THE COURT SHOULD DENY PARMAR'S MOTION TO DISMISS FOR LACK OF VENUE BECAUSE THE INDICTMENT SUFFICIENTLY ALLEGES THAT THE CHARGED OFFENSES OCCURRED IN THE DISTRICT OF NEW JERSEY AND ELSEWHERE. .................................. 63

    A.    Applicable Venue Standards. ............................................. 63

    B.    The Indictment Sufficiently Alleges Venue. ..................................... 66

V.    THE COULD SHOULD DENY PARMAR'S MOTION TO DISMISS THE CONSPIRACY COUNT AS DUPLICITOUS BECAUSE IT ALLEGES A SINGLE SCHEME TO DEFRAUD. .............................................. 70

VI.    THE COURT SHOULD DENY PARMAR'S REQUEST FOR THE EXTREME SANCTION OF DISMISSAL OF THE INDICTMENT BECAUSE IT IS BASED ON PURE AND UNSUPPORTED SPECULATION OF MISCONDUCT BEFORE THE GRAND JURY. ....... 77

VII.    THE COURT SHOULD REJECT PARMAR'S MERITLESS CLAIMS REGARDING EMAILS THE GOVERNMENT LAWFULLY OBTAINED. 82

    A.    The Government Lawfully Obtained the Subject Emails During its Investigation. ............................................................ 82

    B.    Even if the Court Accepts Parmar's Conclusory and Speculative Allegations as True for Purposes of this Motion, He is Not Entitled to Relief Under the Fourth Amendment. ......................................... 84

    C.    Parmar is Not Entitled to An Evidentiary Hearing. ........................ 89

    D.    There is No Basis to Disqualify the Current Prosecution Team. ...... 91

VIII.    THE COURT SHOULD DENY PARMAR'S MOTIONS TO DISMISS UNDER THE DUE PROCESS CLAUSE AND THE COURT'S SUPERVISORY AUTHORITY BECAUSE HIS MISCONDUCT ALLEGATIONS ARE MERITLESS. ........................................... 93

    A.    Parmar Cannot Demonstrate Outrageous Government Misconduct. ............................................................ 93

B.    Parmar is Not Entitled to Dismissal Under the Court's Supervisory
Authority........................................................................................ 98

IX.    PARMAR'S    UNTIMELY    AND    REDUNDANT    MOTION    FOR
DISQUALIFICATION IS FRIVOLOUS. ...................................................... 99

X.    PARMAR'S MOTION TO DISMISS THE FORFEITURE ALLEGATION
SHOULD BE DENIED. .................................................................................... 99

A.    Parmar's Motion to Dismiss the Forfeiture Allegation Finds No
Support in the Case Law.................................................................. 100

B.    Parmar's Claim that the Bank Accounts Seized Pursuant to Seizure
Warrants Should be Released is Meritless. ................................... 102

C.    The Forfeiture Statutes Allow the Government to Restrain Property
Held in the Names of Third Parties Other than Parmar. .............. 103

CONCLUSION.................................................................................................. 106

## PRELIMINARY STATEMENT

Between May 2015 and September 2017, defendants Paul Parmar, Pavandeep Bakhshi, Sotirios Zaharis, and Ravi Chivukula orchestrated and carried out an elaborate scheme to defraud a private investment firm and a group of lenders out of hundreds of millions of dollars in connection with a domestic merger transaction that converted a publicly-traded health care services company ("Company A") into a private entity (the "Go Private Transaction"). This brazen and multi-layered fraud involved a variety of deceptive tactics designed to artificially inflate Company A's value and dupe the investors and lenders, including: purported acquisitions by Company A of non-existent companies or corporate shells portrayed as profitable enterprises; fabricated accounting records and fake financial statements; and phony customers and related revenue streams. The scheme generated tens of millions of dollars in illicit profits and caused substantial losses to the victim investors and lenders.

As a result of this criminal conduct, the defendants are charged in a three-count indictment with conspiracy to commit securities fraud, securities fraud, and wire fraud. The defendants' pretrial motions–which collectively seek dismissal of the indictment or certain counts, severance, a bill of particulars, and other relief–are meritless and should be denied. Their arguments misapply both the law and the facts.

1

First, Bakhshi has not satisfied the "heavy burden" required for severance: he cannot demonstrate that denial of severance would lead to "clear and substantial prejudice resulting in a manifestly unfair trial." *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005). The indictment charges a single scheme and conspiracy between Parmar, Bakhshi and others. Principles of judicial economy and efficiency, the Federal Rules of Evidence, and Third Circuit precedent require joinder of the defendants under these circumstances.

In seeking severance, Bakhshi advances two arguments as to why a joint trial would be unfair: (1) Parmar's proffer statements, *if introduced by the Government at trial*, could violate Bakhshi's Sixth Amendment rights pursuant to *United States v. Bruton*, 391 U.S. 123 (1968); and (2) Parmar has evidence that neither Bakhshi nor the Government is permitted to use at trial under the terms of an agreement that Bakhshi and the Government voluntarily negotiated to resolve a dispute over the Government's lawful search of Bakhshi's email account. As explained further below, these arguments are built on a series of overstated hypotheticals, are premature, and can be addressed through less severe remedies than severance, such as sanitizing the proffer statements. And, with respect to the email account evidence, the problems Bakhshi predicts are the product of his own design. Indeed, Bakhshi voluntarily (and with the advice of experienced and sophisticated counsel) negotiated away his ability

to use at trial emails from his account, without conditioning in any way that agreement on severance.  He cannot now complain that the result is an unfair trial.

Second, Bakhshi is not entitled to a bill of particulars, which is required only if an indictment is too vague to permit the defendant to understand the nature of the charges against him and prepare a defense, avoid unfair surprise, and assert a claim of double jeopardy where appropriate.  The detailed indictment in this case serves all of these functions.  Beyond that, the Government's comprehensive discovery productions (including numerous law enforcement reports of witness interviews conducted by the Government) and prior charging documents supplement the factual gaps Bakhshi alleges.  Bakhshi's motion for particulars appears to be more of an effort to gain an unwarranted tactical advantage for trial by obtaining a detailed roadmap of the Government's trial strategy, and to limit the Government's presentation of evidence at trial, than a legitimate exercise in preparing a defense and avoiding unfair surprise.  Because the indictment coupled with the Government's extensive discovery equip Bakhshi with everything needed to understand the charges and prepare his defenses, a bill of particulars is not warranted.

Third, Bakhshi's motion to dismiss the substantive securities fraud count (Count Two) confuses civil securities fraud pleading standards with their more flexible criminal counterparts, and ignores the express language in the indictment, which clearly alleges that Bakhshi and his co-conspirators engaged in fraudulent

conduct in connection with a *domestic* securities transaction.  At this stage, nothing more is required under Rule 7 or the securities laws.

Parmar's attacks against the indictment are similarly flawed.  He asks the Court to dismiss the indictment on venue grounds, even though it plainly alleges that the charged offenses occurred in the District of New Jersey and elsewhere.  The Government will present evidence that numerous acts in furtherance of the conspiracy occurred in New Jersey–but those are trial issues.  For now, the indictment adequately alleges venue.

Parmar also challenges the conspiracy count (Count 1) as "duplicitous because it alleges multiple and conflicting conspiracies in a single count."  Contrary to Parmar's misguided reading of the indictment, it alleges one scheme.  The differences between the time period of the conspiracy count and the substantive securities fraud count make perfect sense: the conspiracy to inflate the value of Company A began no later than 2015, well before any actual transaction to take the company private or sell it.  The eventual transaction that allowed the defendants to monetize their efforts (the Go-Private Transaction) occurred later, between 2016 and early 2017, as charged in Count Two.  There is nothing confusing, duplicative, or in conflict with these dates or the conspiracy count.

Parmar's remaining motions are based on unsupported, speculative, and in some instances, wholly made up, allegations of Government misconduct.  These allegations continue a strategy Parmar has attempted to execute since the inception of this criminal prosecution: deflect the attention away from his own unlawful

4

conduct to the victims of his fraud who, according to Parmar, are the real wrongdoers. This Court has reviewed and dismissed many of the same allegations from Parmar in other related cases.  It should do the same here.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

This case involves a complex scheme to defraud a private investment firm (referred to in the indictment as the "Private Investment Firm") and others in connection with the Go-Private Transaction. The scheme is described in detail in two criminal complaints and the 15-page indictment (Mag. No. 18-8040, Doc. No. 1; Mag. No. 18-8177, Doc No. 1; Crim. No. 18-735, Doc. No. 32). Below is a general overview of those facts drawn from the charging documents.

### A.    Background of the Go-Private Transaction

Company A was a publicly-traded company that Parmar controlled.[1] Through a web of operating subsidiaries, Company A provided outsourced revenue cycle management ("RCM"), physician practice management, and other related services to hospitals and medical practices in the United States. Company A was incorporated in Delaware in or around September 2014 for the purpose of becoming a holding company for the "Operating Company," which owned several subsidiary entities engaged in the businesses referenced above. In or around December 2014, Company A's securities began trading on the Alternative Investment Market ("AIM") of the London Stock Exchange ("LSE").

Between around April 2016 and November 2016, the Private Investment Firm and Company A engaged in negotiations relating to the Go-Private Transaction. The Go-Private Transaction was structured so that a special purpose entity managed by

---

[1]  During the time period of the scheme, defendant Zaharis was the Chief Financial Officer of Company A, and Chivukula was on the board of directors and worked closely with Parmar and his co-conspirators in carrying out the fraud. Zaharis and Chivukula have been fugitives since this case was initially charged by criminal complaint in May 2018.

the Private Investment Firm would ultimately own a controlling interest in Company A and the balance would be owned by a Parmar-controlled entity.

In June 2016, Parmar delivered a presentation to the Private Investment Firm during which he portrayed Company A as a growing force in the medical billing industry, touting the company's expansion of operations into over twenty states through its organic growth and numerous acquisitions, including the following three separate purported medical billing and/or RCM businesses: MDRX Medical Billing ("MDRX"); Phoenix Health, LLC ("Phoenix"); and Northstar First Health, LLC ("Northstar"). Bakhshi, Zaharis, and Chivukula assisted in preparing the PowerPoint presentation for the meeting.

Pointing to organic growth and Company A's acquisitions, Parmar represented to the Private Investment Firm that Company A's earnings and revenue were growing rapidly and exceeded expectations in the fifteen months following its listing on the AIM.

Additionally, during the negotiations, the co-conspirators provided extensive documents to the Private Investment Firm regarding Company A's purported financial condition, performance, and business operations. These documents included Company A's public filings on the AIM, presentations that the co-conspirators made to the Private Investment Firm, financial statements for certain of Company A's subsidiary companies, information about numerous purported customers of Company A and its subsidiaries, bank records, and customer contracts. The co-conspirators represented to the Private Investment Firm that the information

7

in these materials was true and accurate, and the Private Investment Firm relied on these representations in deciding to pursue the Go-Private Transaction. However, many of these documents contained material misrepresentations or omissions, or were completely fabricated by the co-conspirators, in furtherance of the scheme.

Based upon the information provided by the co-conspirators, the Private Investment Firm valued Company A at more than $300 million. The transaction closed in January 2017. As part of the financing, the Private Investment Firm put up approximately $82 million in equity and a consortium of financial institutions (the "Lenders") provided another approximately $130 million in debt.

**B.    Overview of the Defendants' Fraudulent Tactics**

The defendants employed a variety of fraudulent techniques to induce the Private Investment Firm, the Lenders, and others to fund the transaction. These tactics included, but were not limited to: (1) falsifying and, in some cases, wholly fabricating, bank and accounting records of subsidiary entities, including the Operating Company, in order to generate a phony picture of Company A's revenue streams; (2) generating fake income streams and, in some cases, fabricating customers of Company A and its subsidiaries; (3) creating fictitious operating companies that Company A purportedly acquired in sham acquisitions; and (4) making other material misrepresentations and omissions to representatives of the Private Investment Firm, the Lenders, and others.

*False Accounting Entries and Fabricated/Altered Bank Statements*

The defendants inflated Company A's revenue and overall value by fabricating transfers, customer receipts, and other purported income to Company A and its subsidiaries, including the Operating Company.   The defendants created false entries in the Operating Company's accounting records to create the appearance of customer revenue.  These entries either reflected transactions that never occurred, or represented transfers into the Operating Company's bank accounts from related companies, rather than revenue from third-party customers.   The Operating Company's revenue, as Company A's primary subsidiary, had a significant impact on Company A's overall financial performance.

The defendants created fake or altered bank statements to match the fraudulent and mischaracterized transactions set forth in the Operating Company's accounting records and to further create the impression of real revenue to the Operating Company.  The defendants also created fake bank statements for other purported subsidiaries of Company A, including a fictitious entity the defendants created as a part of the scheme.

*Bogus Customers and Customer Contracts*

The defendants fabricated customers and associated revenue of certain of Company A's subsidiaries, including the Operating Company.   During the due diligence period of the Go-Private Transaction, the co-conspirators sent the Private Investment Firm information concerning customers that either did not exist or that had no relationship with the Operating Company.

In or around late January 2016, Zaharis leased temporary office space throughout the country for numerous companies that the defendants claimed were real customers of the Operating Company. The fake office locations were designed to further create the appearance that these entities were legitimate clients of the Operating Company.

*Fake Operating Companies and Sham Acquisitions*

To further inflate Company A's revenues and overall value, the defendants orchestrated sham acquisitions by Company A of three separate purported medical billing and/or RCM businesses: Northstar; Phoenix; and MDRX.

Each of the three transactions followed a similar pattern: Company A raised money for the purported acquisition through a secondary stock offering on the AIM; the target or acquired company was formed shortly before the announced acquisition; and the funds raised for the acquisition were used for other purposes. In all three transactions, the defendants made numerous false and misleading statements about the assets, operations and value of the acquired companies. In reality, Phoenix and MDRX had no real assets or revenues, and Northstar had one asset that was worth substantially less than the amount Company A claimed to have used to acquire it.

Bakhshi played a central role in the MDRX aspect of the fraud, including assisting with the preparation and development of a stock purchase agreement among MDRX's purported shareholders, MDRX's website, and Company A's press release announcing the acquisition. Not only did the defendants fabricate this company, but they also stole the description of MDRX that they used in press releases

10

announcing the acquisition from pitch materials Parmar and Zaharis had previously received relating to the possible recapitalization of a real company operating in the RCM space.

After Company A publicly announced the purported acquisition of MDRX in December 2015, a financial advisor familiar with the real company the defendants used as the model for MDRX inquired about the announcement.  The financial advisor emailed Zaharis: "Sam, I just left you a voicemail on an important matter concerning [Company A's] announcement of the MDRX acquisition.  In reading the press release we noticed that the company description appears nearly identical to the … description in our Confidential Information Memorandum … As we are not familiar with MDRX, we wanted to confirm with you which of these facts are in fact correct and which may have been clerical errors. Please advise."  Zaharis promptly forwarded this email to others, including Parmar and Bakhshi.  In one such email to Bakhshi, Zaharis wrote, "Not good…………………"  Bakhshi replied simply, "Oh fuck."  When Zaharis replied that he would call Bakhshi, Bakhshi responded, "Pls.  We need to be ready for this."

The defendants used the money raised from the sham secondary stock offerings for other purposes.  For example, the funds from one such secondary offering were used to, among other things, make it falsely appear as though the Operating Company had substantial customer revenue when, in fact, the customer revenue was simply comprised of transfers of the money that had been raised in the secondary offering.  In order to make it appear as though the funds were revenue, the defendants

created phony customers and altered bank statements to create the illusion that the funds had originated with the phony customers.

As noted above, during the due diligence period of the Go-Private Transaction, the defendants provided the Private Investment Firm and others extensive information that was false, fraudulent, and misleading.  This included the defendants' June 2016 presentation to the Private Investment Firm and Lenders which, among other things, touted the sham acquisitions of MDRX, Northstar and Phoenix.  Each defendant assisted in preparing the slides Parmar used during that presentation.

*Impact of the Fraud on Company A's Financial Statements*

This elaborate criminal scheme had a substantial impact on Company A's financial statements and resulted in grossly inflated revenue, income, and earnings figures for the time period the Private Investment Firm evaluated in determining to pursue to the Go-Private Transaction.

The scheme to defraud was uncovered in or around September 2017, around the time certain of the co-conspirators resigned from their positions with Company A or were terminated.  On March 16, 2018, Company A and numerous of its affiliated entities filed a petition for Chapter 11 relief in the United States Bankruptcy Court, Eastern District of New York (the "Bankruptcy Proceedings").  The petition attributes Company A's financial demise, in large part, to the defendants' scheme.

In February 2019, the court in the Bankruptcy Proceedings entered an order confirming a plan of liquidation pursuant to Chapter 11 of the Bankruptcy Code.  *See*

12

*In re: Orion Healthcorp Inc., et. al*, Case No. 18-71748 (AST) (EDNY).  According to

a liquidation analysis filed in the Bankruptcy Proceedings on January 6, 2019, the

debtors' assets (which include funds held by the federal government and real estate

properties) under the Chapter 11 plan were valued at approximately $150 million,

with the total amount of claims from secured lenders, general unsecured creditors,

subordinated creditors, and interest holders exceeding that amount by more than

$100 million (approximately $267 million).  *Id.*, Doc. No. 644-3.[2]

### C.    The Criminal Prosecution

Parmar, Zaharis, and Chivukula were charged by criminal complaint on May

15, 2018.  Doc. No. 1.  Parmar was arrested the following day and detained pending

various bail hearings.[3]  The Court set bail conditions on July 12, 2018.  Zaharis and

Chivukula have not yet been arrested and remain fugitives.  On September 19, 2018,

---

[2]  In making arguments about the valuation of Company A, Parmar refers to "Bankruptcy auction revenue".  (*See* Parmar's Memorandum of Law in Support of Motion to Dismiss the Indictment and Motion to Suppress Evidence ("Parmar Br.") at 11, n 5).  According to a declaration filed in the Bankruptcy Proceedings by the debtors' chief restructuring officer, the debtors engaged in a process to market and sell substantially all of the initial debtors' assets prior to the Chapter 11 plan confirmation.  The process resulted in the sale of "substantially all of their assets related to their revenue cycle management business line" for $12.6 million, and the sale of "substantially all of its assets related to its independent physician association business" for $16.5 million.  *See* Declaration of Timothy J. Dragelin, Case No. 18-71748 (AST) (EDNY), Doc. No. 685, ¶ 14.  While Company A's value has no relevance to the pending pretrial motions for reasons explained below, to the extent the Court is inclined to look to the Bankruptcy Proceedings, and the auction figures in particular, as a valuation benchmark, the revenue generated from these auction sales represents a small fraction of the approximately $300 million value that the victims placed on Company A based on the fraud.

[3]  Judge Wettre granted the Government's motion for pretrial detention after bail hearings on May 16 and 31, 2018.  Doc. Nos. 6, 15.  Parmar appealed Judge Wettre's detention order. After a hearing on Parmar's appeal, Judge Vazquez granted Parmar pretrial release and set conditions on July 12, 2018.  Doc. No. 23.  Certain of those conditions were modified on December 16, 2019.  Doc. No. 72.

Bakhshi was charged in a separate criminal complaint based on the same scheme. Mag. No. 18-8177. Bakhshi was arrested on December 10, 2018 after arriving in the United States from the United Kingdom.

On December 13, 2018, a grand jury returned a three-count indictment charging all four defendants with conspiracy to commit securities fraud (Count One), securities fraud (Count Two), and wire fraud (Count Three). Trial has not yet been scheduled.

D.    **Discovery Productions**

The Government has made voluminous discovery productions since the indictment was returned. The productions included at least tens of thousands of records the Government received from third parties, including email communications and financial records. The Government has produced many documents earlier than required as a courtesy to the defense, such as law enforcement reports of witness interviews (including all of the witnesses the Government currently intends to call at trial). The Government's productions were accompanied by detailed indexes setting forth the contents of the materials and the bates numbers.

The Government's discovery productions included records that Google produced in June 2018 (the "Google Production") in response to a search warrant relating to Bakhshi's personal email account (the "Bakhshi Email Account"). The Government produced the full contents of the Google Production to Bakhshi and produced the same records to Parmar, except for documents the Government

identified in its document review database as potentially privileged based on search terms a government filter team applied in consultation with Bakhshi's counsel.[4]

More recently, Bakhshi's counsel raised issues with the Government regarding its review of the Google Production, and advised the Government that Bakhshi was considering a suppression motion. The Government consistently conveyed its position to Bakhshi's counsel that its actions regarding the email account were reasonable and complied with the Fourth Amendment. That said, the overwhelming majority of the documents from the Google Production that the Government had identified as potential trial evidence were duplicative of documents the Government received from other sources (e.g., an email from Parmar to Bakhshi that the Government obtained from Company A, as well as from the Google Production). Based on those circumstances, and to avoid needless litigation and associated delays in the case, the Government agreed to not use in its case-in-chief emails from the Google Production. Bakhshi also agreed to not use emails from the account at trial. The parties memorialized the terms of the agreement in a letter dated March 5, 2021 and executed on March 9, 2021. *See* Bakhshi Motion for Severance, Ex. H, Doc. No. 106.

---

[4] The potentially privileged documents were segregated and removed from the prosecution team's access and sent to Bakhshi's counsel for privilege review. At Bakhshi's request, the Government also agreed that the filter team would segregate certain other documents that Bakhshi claimed were potentially privileged and also appeared to be unrelated to the charges in the indictment. The filter team segregated those documents using search terms provided by Bakhshi's counsel. The prosecution team has not reviewed those documents and they remain segregated and restricted from the prosecution team's access, along with the documents Bakhshi identified as privileged. None of the documents segregated and restricted from the prosecution team have been produced to Parmar.

Additionally, the Government has produced in discovery data from a cell phone law enforcement seized from Parmar at the time of his arrest in May 2018. Similar to the Bakhshi Email Account, the Government employed a filter review process in coordination with Parmar's counsel to screen and segregate from the prosecution team potentially privileged communications from the cell phone. Materials not subject to Parmar's privilege assertions were released to the prosecution team and produced in discovery.[5]

## ARGUMENT

## I.    THE COURT SHOULD DENY BAKHSHI'S SEVRANCE MOTION.

Bakhshi tries very hard to orchestrate two scenarios necessitating severance. According to Bakhshi, "there is no way to avoid the risk of prejudice to Mr. Bakhshi other than severing the trials" of Bakhshi and one of his co-defendants, Parmar. (Bakhshi Sev. Br. at 1).[6] Bakhshi claims this is because there exist (1) unavoidable *Bruton* issues and (2) prejudice stemming from an agreement that Bakhshi himself sought and negotiated with the Government. Bakhshi jumps through many hoops to try to make severance a reality, but his arguments are premature and transparently self-constructed and should be rejected.

---

[5] At Parmar's request, the Government also agreed to withhold from discovery productions certain media files from the cell phone that Parmar claimed were personal in nature. The Government reviewed those files and determined that they were not subject to disclosure under any discovery authorities.

[6] Bakhshi's brief in support of his motion for severance will be referred to as "Bakhshi Sev. Br." and his brief in support of his motion to dismiss and for a bill of particulars will be referred to as "Bakhshi Br."

A.   **Legal Standard Under Rule 14.**

It is a "fundamental principle that the federal system prefers 'joint trials of defendants who are indicted together.'" *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *see also United States v. Sandini*, 888 F.2d 300, 306 (3d Cir. 1989) ("[I]n cases of defendants jointly indicted ordinarily there should be a single trial."). As set forth below, this preference for joint trials is especially strong where, like here, the defendants are charged in the same conspiracy. *See United States v. Inigo*, 925 F.2d 641, 656 (3d Cir. 1991) (because it is "customary" to try co-conspirators together, severance under Rule 14 is justified "only for compelling reasons"). This preference for joint trials exists for several reasons.

Joint trials promote systemic judicial efficiency. *See, e.g., United States v. Lane*, 474 U.S. 438, 449 (1986) (noting that the Supreme Court has "long recognized that joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial'") (quoting *Bruton v. United States*, 391 U.S. 123, 134 (1968)); *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991) ("Ordinarily, defendants jointly indicted should be tried together to conserve judicial resources."); *United States v. Blassingame*, 197 F.3d 271, 286 (7th Cir. 1999) (systemic interest in joint trials includes "reducing the waste of judicial and prosecutorial time").

 Such a concern is particularly acute here where the charged conduct involves a massive multi-year conspiracy resulting in hundreds of millions of dollars of losses,

where the trial is accordingly expected to last several weeks, and where the same
evidence would be admissible in separate trials. *See United States v. Hart*, 273 F.3d
363, 370 (3d Cir. 2001) ("acts committed by one [co-conspirator] in furtherance of the
conspiracy [would be] admissible against the other" co-conspirator in a separate trial);
*United States v. DePeri*, 778 F.2d 963, 984 (3d Cir. 1985) ("[P]ublic resources . . .
would be lost if the same evidence were presented at separate trials."); *Eufrasio*, 935
F.2d at 569, 571 (severance not warranted where there would be "substantial overlap
in the evidence presented in separate trials" and there is "substantial public interest
in the judicial economy of a joint trial"); *United States v. Fernandez*, 388 F.3d 1199,
1242 (9th Cir. 2004) ("[A] joint trial is particularly appropriate where the co-
defendants are charged with conspiracy, because the concern for judicial efficiency is
less likely to be outweighed by possible prejudice to the defendants when much of the
same evidence would be admissible against each of them in separate trials.").

In addition, a joint trial allows the jury to obtain "a more complete view of all
the acts underlying the charges than would be possible in separate trials.  From such
a perspective, it may be able to arrive more reliably at its conclusions regarding the
guilt or innocence of a particular defendant and to assign fairly the respective
responsibilities of each defendant in the sentencing." *Buchanan v. Kentucky*, 483
U.S. 402, 418 (1987).  This "more complete view," in turn, "serve[s] the interests of
justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson v.
Marsh*, 481 U.S. 200, 210 (1987); *see United States v. Sophie*, 900 F.2d 1064, 1083
(7th Cir. 1990) (a joint trial "aids in the search for truth" by giving one jury "the case

18

as a whole" as opposed to "bits and pieces" being presented to several juries).

Joint trials of co-conspirators are particularly favored because only with a single trial can the jury see the complete picture of the conspiracy, thus "enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit." *Richardson*, 481 U.S. at 210; *see also United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996).  Indeed, "[r]arely, if ever, will it be improper for co-conspirators to be tried together." *United States v. Stephenson*, 924 F.2d 753, 761 (8th Cir. 1991).  And in the Third Circuit there is a preference in conspiracy cases "to have all of the parties tried together so that the full extent of the conspiracy may be developed." *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir. 1982); *accord United States v. Dickens*, 695 F.2d 765, 778-79  (3d Cir. 1983).

Moreover, separate trials often "randomly favor[] the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." *Richardson*, 481 U.S. at 210.  This "advantage" is sometimes only tactical, but sometimes it is far more sinister.  Separate trials "requir[e] victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying," *id.*, and last-tried defendants have the benefit of knowing who, if anyone, is cooperating with law enforcement.  *See, e.g., United States v. Taylor*, 293 F. Supp. 2d 884, 899 (N.D. Ind. 2003); *United States v. Milburn*, Crim. No. 05-167, 2008 WL 2557973, at *3 (N.D. Cal. June 24, 2008).

For all of these reasons, Rule 14 "places the burden of showing prejudice from the joinder on the defendant seeking severance." *Eufrasio*, 935 F.2d at 568 (citing *United States v. De Peri*, 778 F.2d 963, 983 (3d Cir. 1985)).  Indeed, due to the

powerful interests favoring joint trials, "defendants have a heavy burden in gaining severance." *United States v. Quintero*, 38 F.3d 1317, 1343 (3d Cir. 1994); *see also United States v. Console*, 13 F.3d 641, 655 (3d Cir. 1993) (defendant seeking severance bears a "heavy burden"). This "heavy burden" requires Defendants to prove "that the denial of severance would lead to 'clear and substantial prejudice resulting in a manifestly unfair trial.'" *Urban*, 404 F.3d at 775 (quoting *United States v. Palma-Ruedas*, 121 F.3d 841, 854 (3d Cir. 1997)); *see also Lore*, 430 F.3d at 205. Severance is not justified by "[m]ere allegations of prejudice," nor is it enough to "establish that severance would improve the defendant's chance of acquittal." *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981); *see Eufrasio*, 935 F.2d at 568. This is also not an "if prejudice, then severance" causation analysis. Rather, the Supreme Court has held explicitly that even a showing of *some* prejudice is insufficient to justify severance: "Rule 14 does not require severance even if prejudice is shown." *Zafiro*, 506 U.S. at 538-39.

The Supreme Court has imposed such a heavy burden because a district court can protect against nearly all prejudice by crafting remedies short of severance. *See Id.* at 539 (noting that "less drastic measures [than severance], such as limiting instructions, often will suffice" to cure any risk of prejudice). The tailoring of the relief to be granted, if any, is reserved for "the district court's sound discretion." *Id.* at 539. Commonly, this relief consists of limiting instructions to the jury, directing jurors "to compartmentalize the evidence by considering the evidence separately as to each defendant and each count." *Lore*, 430 F.3d at 205-06. The Supreme Court

20

has repeatedly recognized "[t]he rule that juries are presumed to follow their instructions." *Richardson*, 481 U.S. at 211. In fact, the Third Circuit regards limiting instructions as "persuasive evidence that refusals to sever did not prejudice the defendants." *Lore*, 430 F.3d at 206 (quotation marks and citation omitted). And where the trial judge "perceives no such need to sever" under Rule 14, that decision is accorded broad deference by the appellate courts." *United States v. Thomas*, 610 F.2d 1166, 1171 (3d Cir. 1979).

**B.   Bakhshi's Manufactured Claims of Prejudice Do Not Require Severance Under Rule 14 and Ignore Clear Alternative Solutions.**

### 1.   Defendant's *Bruton* Claim

Bakhshi asserts that there is "no way" to protect his 6th Amendment rights at trial short of severance due to the potential admission of proffer statements of co-defendant Parmar. (Bakhshi Sev. Br. at 1). Bakhshi not only overcomplicates the *Bruton* analysis in order to create false urgency about a premature issue, he also disregards at least three likely scenarios at trial that would address his concerns without severance. Namely: (1) Parmar testifies at trial; (2) the Government does not use Parmar's proffer statements at trial; and (3) the Government uses Parmar's proffer statements at trial and sanitizes them according to any rulings by the Court.

### i.   Solution One – Parmar Testifies

Even Bakhshi agrees that if Parmar testifies there are no 6th Amendment concerns because Bakhshi will have the opportunity to cross examine him. (Bakhshi Sev. Br. at 10 n.4). Bakhshi says he can't possibly be expected to wait until trial to find out whether Parmar will testify. But indeed he can wait, because as set forth

below, there are other logical solutions to address any potential *Bruton* issues, even if Parmar does not testify.

### ii. Solution Two – The Government Does Not Use Parmar's Proffer Statements

Bakhshi also brushes aside the very real possibility that the Government does not use the Parmar proffer statements at trial.  According to Bakhshi, "[i]t is difficult to imagine a trial in which the Government does not seek to introduce [the proffer statements]" because they are so powerfully incriminating as to Parmar.  (Bakhshi Sev. Br. at 11 n.7).  Again, Bakhshi attempts to will a severance issue into existence by predicting a scenario that is simply not within his control.

As a threshold matter, the Government cannot automatically use Parmar's proffer statements, as Bakhshi recognizes.  Rather, the Court would need to rule that Parmar's defense strategy has made the statements fair-game under the contours of the proffer agreement.  It is, of course, logical to assume that Parmar's counsel will try to avoid placing the proffer statements at issue, particularly given the detrimental effect such statements would have for Parmar, at least according to Bakhshi:  "[I]t should be noted that [Parmar's] statements are uniquely verbose and incriminating [as to Parmar]; Parmar fully admitted to the Government's charges." (*Id.*).

Regardless, even if the Court determined the Government *could* use Parmar's proffer statements at trial, that does not mean the Government *would* use them.  Bakhshi's clear preference is for the Government to use them—so he can argue for severance, but that simply is not Bakhshi's call.  Indeed, the Government has reiterated its position to Bakhshi on multiple occasions, indicating that the

Government "*may* offer" Parmar's proffer statements at trial—not *shall*—if allowed to under the terms of the proffer agreement.[7] (Bakhshi Sev. Br. at 11). And the Government has not committed to using the statements for good reason. As Bakhshi knows—and likely why he is desperate for severance in this case—the Government has layers upon layers of damning evidence for use at trial. This includes the creation of fraudulent bank statements, phony accounting records reflecting false customer revenues, the concoction of entirely fake operating companies, and more. In other words, use of Parmar's proffer statements at trial would be icing on the cake and hardly the crux of the Government's proofs.

### iii. Solution Three – The Government Uses the Proffer Statements Subject to Any Court Rulings

It is also plausible that the Government seeks to admit Parmar's proffer statements at trial—assuming as a threshold matter that the Court allows it under the terms of the proffer agreement. If the Government proceeds this way, which is not a foregone conclusion, the Government can take steps to ensure that the law enforcement agent's testimony about Parmar's statements is limited in scope to comply with *Bruton,* in accordance with any Court rulings. To attempt to outline the precise contours of the law enforcement agent's testimony now—where the parties are not on trial, on the eve of trial, or even have a trial date—is premature. However,

---

[7] While Bakhshi reports confusion about the Government's position on *Bruton*, Bakhshi Sev. Br. at 6-7, the Government has discussed this subject with him on numerous occasions and explained repeatedly the following: not only is it premature to determine whether the Government will use the statements at trial, it would also be premature, hypothetical, and academic to provide Bakhshi with blacked-out, physical "redactions" to law enforcement reports that, if used at trial at all, would come in through agent testimony and would not themselves be placed before a jury.

as laid out below, there are options to limit/sanitize the law enforcement agent's testimony about Parmar's proffer statements at trial, should the Court determine it appropriate to do so, options which obviate Bakhshi's drastic proposal of severance.

### a. Testimony about Parmar's Statements Can Be Limited to Remove Mention of Bakhshi's Existence.

Bakhshi asserts that it is impossible to comply with *Bruton* by sanitizing Parmar's proffer statements. But as a basic matter, he ignores the Supreme Court's clarification of *Bruton* in *Richardson v. Marsh*, where it held that "the Confrontation Clause is not violated by the admission of a non-testifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, *but any reference to his or her existence.*" 481 U.S. at 211 (emphasis added). In so holding, the *Richardson* Court noted the importance of joint trials in the criminal justice system and that severing trials whenever a co-defendant made an incriminating confession would slow down the process and potentially result in unfair or inconsistent results. *Id.* at 209-10. The Supreme Court made clear that simply excluding co-defendant confessions is "too high" a price, as confessions further "society's compelling interest in finding, convicting, and punishing those who violate the law." *Id.* at 210.

Thus, under *Richardson*, if law enforcement testimony about Parmar's statements were tailored—not to replace references to Bakhshi with neutral terms, but instead to remove any reference to his existence—in combination with a limiting instruction as appropriate, admission of the proffer statements would not violate

*Bruton*.[8]  The Third Circuit has repeatedly reiterated this holding from *Richardson*. *See, e.g.*, *Johnson v. Superintendent Fayette State Corr. Inst.*, 949 F.3d 791, 795 (3d Cir. 2020) ("[N]o constitutional violation exists where a confession is redacted to eliminate 'not only the defendant's name, but any reference to his or her existence.'") (quoting *Richardson*); *U.S. v. Hardwick*, 544 F.3d 565, 572 (3d Cir. 2008) (the Supreme Court held in *Richardson* that defendant's *Bruton* concern "could be cured" by redactions removing "'any reference to [co-defendant's] existence'") (quoting *Richardson*).

To be clear, the Government does not concede that this level of sanitization—removing all references to Bakhshi's existence—is needed.  But it is an option that is available should the Government seek and the Court grant admission of the proffer statements during trial.

Bakhshi essentially ignores this solution and instead cites a litany of cases where replacement of co-defendant names using neutral pronouns was not sufficient. Specifically, Bakhshi cites case after case involving very different factual circumstances—violent crimes such as robbery, kidnapping, murder—where use of non-identifying terms were found to violate *Bruton*.  *See e.g.*, *Hardwick*, 544 F.3d at 572 (murder trial); *United States v. McLaughlin*, Crim. No. 12-0179, 2013 WL 996266, at *8 (M.D. Pa. Mar. 13, 2013) (murder for hire); *United States v. Singleton*, Crim. No. 11-76, 2012 WL 568715, at *1-2 (E.D. Pa. Feb. 22, 2012) (robbery); *Johnson*,

---

[8] As discussed below, the Court could also instruct the Government to sanitize the statements in the same manner as to the other co-defendants, Chivukula and Zaharis, should it deem that appropriate.

949 F.3d at 796 (murder); *Alvarado v. Wingard*, Civ. No. 17-3283, 2019 WL 6880912, at *11 (E.D. Pa. Jan. 8, 2019) (murder and robbery); *Freeman v. Capozza*, Civ. No. 19-04333, 2021 WL 422637, at *1-2 (E.D. Pa. Feb. 8, 2021) (murder, kidnapping, robbery); *Brown v. Superintendent Greene State Corr. Inst.*, 834 F.3d 506, 508 (3d Cir. 2016) (murder); *Lyle v. Koehler*, 720 F.2d 426, 434 (6th Cir. 1983) (murder); *Vazquez v. Wilson*, 550 F.3d 270, 280 (3d Cir. 2008) (murder).

But it is plain that in such cases, sanitization of the relevant statement by removing any mention of the co-defendant's existence would not be feasible. In other words, where the defendant's inculpatory statement is so intertwined with the co-defendant, removing any mention of the co-defendant's existence would result in a nonsensical description of a discrete event or chain of events. For example, in *McLaughlin*, one defendant hired the other co-defendant to murder his ex-wife. In such a case it is impossible to describe the offense (murder for hire) without at least referring to the existence of the co-defendant who was hired. 2013 WL 996266, at *8 (finding it "difficult to envision substitutions, redactions, or alterations" to co-defendant's statement that would satisfy *Bruton*). Similarly, in *Brown*, the defendant's self-incriminating statement about a murder identified the co-defendant as the person who "pulled the trigger." 834 F.3d at 508. Again, in *Hardwick*, the defendant "had confessed in his proffer statements that he ordered [the victim's] killing," another narrative that necessarily intertwines co-defendants. 544 F.3d at 570-71.[9]

---

[9] In addition, in the types of violent crime cases cited by Defendant, judicial economy is less of a concern due to the shorter length of such trials as compared to a large-scale fraud.

Bakhshi rightly recognizes this distinction and accordingly argues that the references to him in Parmar's self-incriminating statements are irreconcilably "intertwined," but he is wrong. (Bakhshi Sev. Br. at 15). Rather, Bakhshi's analysis of the proffer statements reflects a fundamental mischaracterization of the statements and Bakhshi's role therein.

As an initial matter, Bakhshi hypes the number of times his name is mentioned in Parmar's proffer statements but does not point out that many of these references are to background information and/or are not inculpatory on their face—and, in any event, certainly are not necessarily intertwined with Parmar's admissions about his own conduct.[10]   For example:



- ███████████████████████████████████████[11]   (Bakhshi Sev. Br. Ex. A at 9).

- ████████████████████████████████████████ (Bakhshi Sev. Br. Ex. C at 3).

- ████████████████████████████████████ (*Id.* at 4).

- ██████████████████████████████████████████ (*Id.* at 4-5).

- █████████████████████████████████████████ (*Id.* at 5).

- ██████████████████████████ (*Id.* at 6).

_____

[10]   Nor does Bakhshi acknowledge that multiple references to his name in the proffer statements that he includes in his tally are by way of questions posed to Parmar by law enforcement, rather than contained in Parmar's substantive responses.

[11]   Indeed, this is the only reference to Bakhshi at all in the first of the three Parmar statements that Bakhshi attaches to his briefing. (*See* Bakhshi Sev. Br. Ex. A).

But even inculpatory statements about Bakhshi can be separated from Parmar's own self-incriminating statements without distorting the narrative.  Such statements about Bakhshi generally circle the same broad themes:

- ██████████████████████████ (*See, e.g.*, Bakhshi Sev. Br. Ex. C at 3 ████████████████████████████████ *id.* at 4).

- ██████████████████████████████████ (*See, e.g.*, *id.* at 4; Bakhshi Sev. Br. Ex. D at 3).

- ████████████████████████████████ (*See, e.g.*, Bakhshi Sev. Br. Ex. D at 3).

At bottom, Parmar's admissions about his own conduct are that he orchestrated the three fictitious acquisitions in order to boost Company A's revenue and did so unbeknownst to the Private Investment Firm.  Plenty of Parmar's inculpatory statements focus on Parmar himself and his own knowledge and intent, without involving others.  For example, Parmar's self-incriminating statements include:

- ████████████████████████████████ (Bakhshi Sev. Br. Ex. C at 3).

- ████████████████████████████████ (*Id.* at 4).

- ████████████████████████████████ (*Id.* at 5).

- ████████████████████████████████ (*Id.*)

28

That the defendants are charged in a conspiracy does not mean that some of Parmar's inculpatory statements cannot stand on their own, without reference to co-conspirators.  And unlike in the cases cited by Bakhshi, none of the categories of Bakhshi-related inculpatory information in Parmar's statements is necessary to present Parmar's incriminatory statements about himself to a jury (should the Government seek to do so).  This is particularly so were the Government to limit its use of Parmar's statements to certain basic points about the fraud.

### b. Parmar's Statements Can Also Be Sanitized Using Neutral Terms.

In addition to the *Richardson* approach set forth above, the Court also maintains the option of ordering sanitization of Parmar's statements using neutral pronouns.  Defendant's primary complaint with this method is that the jury will assume any neutral terms refer to Bakhshi because he is expected to be the only other defendant physically present for trial alongside Parmar.[12]  (Bakhshi Sev. Br. at 14).  But unlike in many of the cases Bakhshi cites, there are not *only* two defendants charged here.  *See, e.g.*, *McLaughlin*, 2013 WL 996266, at *1 (two defendants charged); *Singleton*, 2012 WL 568715, at *1 (two defendants charged); *Brown*, 834 F.3d at 509 (two defendants charged).  Four defendants are named in the indictment, and at trial, the jury will hear not only about the criminal conduct of Parmar and Bakhshi, but about Chivukula and Zaharis as well.  Bakhshi also asserts that the anonymized players will need to be distinguished from one another otherwise the jury

---

[12] Obviously, that would not be the case if Chivukula or Zaharis were to be apprehended in advance of trial.

will assume that they all refer to him—and that if they are distinguished, the jury will *know* that one refers to him. (Bakhshi Sev. Br. at 14). But as Bakhshi recognizes, courts are to apply "a holistic approach when considering redacted confessions" rather than "bright-line rule[s]," and accordingly, "neutral pronoun[s] may satisfy *Bruton*" depending on the circumstances. *Johnson*, 949 F.3d at 796.

To say at this juncture that there is no way for neutral terms to be applied in this case is premature and shortcuts the analysis. Indeed, depending on the portions the Government seeks to admit (if any), it is very possible that Bakhshi's name, and the names of the other co-conspirators as appropriate, could all be replaced with neutral terms in a manner that does not run afoul of *Bruton*. In addition, the Court can supplement these measures with limiting instructions about the admitted portions, as appropriate. And again, as set forth above, if the Court finds neutral replacements are not sufficient at trial, all references to Bakhshi's existence (and other co-defendants as needed) can be omitted. Indeed, the tailoring of any relief under Rule 14 is left to the district court's "sound discretion." *Zafiro*, 506 U.S. at 539.

*** 

In short, selecting the precise scope of any hypothetical sanitization of the law enforcement officer's hypothetical testimony is not a practical or efficient use of the Court's time or resources at this stage. The Government, however, does not oppose either of the options addressed above for limiting the agent's testimony—or any others endorsed by the Court, particularly when, as discussed above, the proffer

statements simply are not the linchpin of the Government's case, and the Government very well may choose to forgo use of them entirely.

### iv. Co-Defendant Use of the Proffer Statements

Anticipating correctly that the Government does not need to use the proffer statements in full at trial (if at all), Bakhshi then shifts course, arguing that it is instead Parmar's counsel who will create a *Bruton* issue by attempting to "complete the narrative" of Parmar's statements. (Bakhshi Sev. Br. at 16). Bakhshi gives short-shrift to this argument, and for good reason, as it ignores that there are powerful limitations on what Parmar's counsel can do on cross-examination should the Government even seek to admit the statements. In addition, established case law makes clear that if the Government does not use Parmar's proffer statements at trial, Parmar cannot introduce the statements without subjecting himself to cross-examination. And, of course, Parmar testifying would obviate any 6th Amendment concerns as Bakhshi would have the opportunity to confront Parmar.

It is well-settled under the Federal Rules of Evidence that a defendant cannot offer his own out-of-court statement without testifying because it is inadmissible hearsay; the Government, in contrast, can admit a defendant's statement as an admission by an opposing party. *See* Fed. R. Evid. 801(d)(2). This reasoning applies where a defendant seeks to admit an exculpatory statement the Government did not admit and where he seeks to admit portions of a statement otherwise relied upon by the Government. *See, e.g.*, *United States v. Hoffecker*, 530 F.3d 137, 191-92 (3d Cir. 2008) (allowing defendant to admit exculpatory portions of statement would be

"tantamount to allowing [defendant] to testify without being subject to cross-examination," but the Government was properly allowed to play other portions of the statement as "admissions by a party opponent" under Rule 801(d)(2)); *United States v. Cooya*, Crim. No. 08-70, 2012 WL 1414855, at *5 (M.D. Pa. Apr. 24, 2012) (explaining that "self-inculpatory statements, when offered by the Government," are not hearsay and are admissible under Rule 801(d)(2), but non-self-inculpatory statements defendant sought to introduce would be inadmissible hearsay "even if they were made contemporaneously with other self-inculpatory statements"); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (allowing defendant to "place his exculpatory statements before the jury without subjecting [himself] to cross-examination, [is] precisely what the hearsay rule forbids") (quotation marks and citation omitted); *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999) (a defendant's "own self-serving statements, … as offered by him, are inadmissible hearsay"); *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("The rules do not … provide a[] [hearsay] exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party.").

Bakhshi refers to the "rule of completeness" as a basis for Parmar's counsel to undermine any sanitization of the proffer statements on cross-examination.  (Bakhshi Sev. Br. at 16).  But the rule of completeness does not permit Parmar's counsel the broad leeway Bakhshi implies.  In the context of *Bruton* redactions, the rule of completeness is implicated "only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the

32

declarant." *United States v. Alvarado*, 882 F.2d 645, 651 (2d Cir. 1989); *see also United States v. Smith*, 794 F.2d 1333, 1335 (8th Cir. 1986) (same); *United States v. Persaud*, 605 F. App'x 791, 798 (11th Cir. 2015) (same); *see also Hoffecker*, 530 F.3d at 192 (while not addressing *Bruton* sanitization, explaining that in general the rule of completeness does "not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted") (quotation marks and citation omitted).[13]

And importantly, the rule of completeness does not trump hearsay rules. *See United States v. Ford*, 761 F.3d 641, 652 ("the rule of completeness is not designed to make something admissible that should be excluded") (quotation marks and citation omitted); *Cooya*, 2012 WL 1414855, at *5 (the rule of completeness "does not compel admission of otherwise inadmissible hearsay evidence") (quotation marks and citation omitted). Accordingly, courts commonly reject defendants' efforts to admit self-serving portions of a statement that the Government otherwise relied upon. *See Jackson*, 180 F.3d at 73 (rule of completeness did not require allowing defendant to play additional portions of recording admitted by the Government, which consisted

---

[13] For these same reasons, Bakhshi's suggestion that a defense by Parmar of being "duped" by Bakhshi would require severance under *Bruton* is wrong. (Bakshi Sev. Br. at 16 n.10). Apart from the limitations of the rule of completeness discussed above, in general, "finger-pointing and blame-shifting among coconspirators" does not require severance. *Voigt*, 89 F.3d at 1095; *see also United States v. Barber*, 442 F.2d 517, 530 (3d Cir. 1971) (holding that "the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another" are insufficient grounds to require severance). Indeed, courts have held that severance might be appropriate only when defense theories conflict "to the point of being irreconcilable and mutually exclusive." *Provenzano*, 688 F.2d at 198 (quotation marks and citation omitted).

largely of self-serving statements); *Wilkerson*, 84 F.3d at 696 (rule of completeness was not a basis for defendant to elicit on cross his exculpatory statements, which were hearsay); *Cooya*, 2012 WL 1414855, at *5 (defendant not entitled to admit "other statements he made" simply because the Government admitted some of defendant's statements favorable to its case); *Ortega*, 203 F.3d at 682 (rejecting rule of completeness argument where defendant's self-serving statements were hearsay).[14]

Moreover, it is within the trial court's discretion to shape the admissible evidence at trial in order to balance various interests. *See Alvarado*, 882 F.2d at 651 (in drug conspiracy case, trial court acted "well within its discretion" in admitting redacted confession, rejecting defendant's contention that it be admitted in full, and limiting defendant's scope of cross); *United States v. Ashburn*, Crim. No. 11-303, 2015 WL 5098607, at *52 (E.D.N.Y. Aug. 31, 2015) (while defendant had an interest in

---

[14] Despite this landscape of established hearsay law, in the recent unpublished opinion in *United States v. Zuniga*, Judge Martinotti found that the defendant could, in fact, admit his own proffer statements without testifying. Crim. No. 18-224, 2021 WL 1345867 (D.N.J. April 12, 2021). Specifically, the court determined that defendant intended to offer certain of his statements not for the truth of the matter, but for non-hearsay purposes including establishing state of mind. *Id.* at *6-7. While it is worth noting that the factual circumstances in *Zuniga* are quite different than the instant case (*Zuniga* was a two-defendant drug and weapons case), as a more general matter the Government respectfully submits that not only is *Zuniga* an outlier in a sea of law to the contrary but that *Zuniga* affirmatively misapplies the well-settled law and reaches the wrong result. *See Hoffecker*, 530 F.3d at 192 (rejecting defendant's argument that statements reflected his state of mind and noting that "of course the mere fact that [defendant] claimed he offered the tape for a different purpose does not change the reality that he offered it for its truth"); *Ortega*, 203 F.3d at 683 (defendants "should not be allowed to use the Confrontation Clause as a means of admitting hearsay testimony through the 'back door' without subjecting [themselves] to cross-examination") (citation omitted). Notably, *Zuniga* is not binding on any district judge. In addition, any attempt by the Government to appeal or petition for mandamus regarding the *Zuniga* decision was essentially mooted when one of the defendants pleaded guilty shortly after the severance ruling. *See* Crim. No. 18-224, Doc. No. 119.

having his statements presented in "complete context," court had to balance that against protecting the interests of co-defendants and the interests of "judicial economy, which [were] advanced by a joint trial") (quotation marks and citation omitted); *United States v. Irizarry*, 341 F.3d 273, 306 (3d Cir. 2003) ("[T]he scope of cross-examination is left to the sound discretion of the trial court and [the court of appeals] will reverse only for an abuse of discretion.") (quotation marks and citation omitted); *United States v. Trant*, 924 F.3d 83, 89 (3d Cir. 2019) (trial court enjoys "broad discretion" as to case management at trial).

In short, the Court should follow the established case law that does not allow a defendant to admit his own self-serving statements without subjecting himself to cross-examination, and accordingly, deem any concern regarding Parmar's independent use of the proffer statements without testifying at trial a non-issue.

## 2. Defendant-Initiated Agreement

Bakhshi intensifies his efforts to manufacture a severance issue with his second purported basis for an individual trial. Indeed, Bakhshi himself *created* the situation that he now claims requires severance. Specifically, Bakhshi approached the Government about an agreement that would restrict the use of his email account at trial. Bakhshi negotiated the agreement through sophisticated counsel, and as a result of those negotiations, both he and the Government agreed not to use the email account.[15] The agreement was executed on March 9, 2021—a short time before Bakhshi filed this motion for severance; however, never during negotiations did

---

[15] This agreement includes certain exceptions. (*See* Bakhshi Sev. Br. Ex. H).

Bakhshi indicate that he intended to use the agreement to seek severance or that, in his view, the agreement would make severance unavoidable. Rather, both parties discussed that the agreement would *avoid* motion practice and preserve the Court's resources. Now—to the surprise of the Government— Bakhshi says that based on that agreement, his "trial must be severed." (Bakhshi Sev. Br. at 18).

In short, Bakhshi's severance argument is a transparent attempt to leverage his agreement with the Government into a separate trial. The Court should decline to reward this behavior and hold Bakhshi to the agreement he chose to pursue. Bakhshi's argument that the agreement he initiated requires severance is wrong under the law. Moreover, as with Bakhshi's *Bruton* claims, there are other solutions to Bakhshi's self-imposed claims of prejudice that do not involve severance (should the Court even entertain Bakhshi's concerns—the Government submits that it should not).

It is worth clarifying several points at the outset.

The agreement between the parties specifically notes that it "is intended to preserve the resources of the parties and the Court and avoid unnecessary delay and litigation" and is not an "admission" by the Government. (Bakhshi Sev. Br. Ex. H at 1). Thus, any suggestion that the agreement is a Government concession rather than the result of an arms-length process is incorrect. (*Id.*) ("We maintain that our actions concerning the Email Account at all times were reasonable and complied with the Fourth Amendment."). And, of course, the fact that Bakhshi negotiated away his right to file a motion to suppress (on his own initiative) casts doubt on any intimation

that such a motion by him would necessarily have been successful.

Bakhshi complains that the Government provided the entirety of the email account to Parmar, which according to Bakhshi contained "scores of personal emails that were not responsive to the search warrant." (Bakhshi Sev. Br. at 18). Bakhshi says this is the heart of the severance issue—that Parmar has access to documents that Bakhshi cannot use at trial (because he willingly negotiated that right away). *Id.* But tellingly, Bakhshi has never requested that the Government claw back any of the supposedly overproduced emails from Defendant Parmar. Rather, the parties expressly agreed that the Government would not seek the return of any of the materials produced to Parmar. (*See* Bakhshi Sev. Br. Ex. H at 1-2).

In addition, just as Bakhshi overstates the importance of Parmar's proffer statements at trial, Bakhshi similarly overemphasizes the significance of the email account. Bakhshi attempts to make the email account central to the proofs at trial—but it simply is not. Rather, it is duplicative of documents the Government received from other custodians and is otherwise of limited significance compared to the Government's anticipated trial proofs. That is precisely why when Bakhshi approached the Government about an agreement, it was willing to engage in what it understood to be good-faith negotiations with Bakhshi intended to prevent, not instigate, litigation.

Bakhshi highlights that the email account contains approximately 50,000 documents, Bakhshi Sev. Br. at 19, but to place that in context, the Government has produced many more tens of thousands of documents in discovery in this case.

Moreover, many of these emails are duplicative of documents the Government has obtained (and produced to defendants) from other sources; for this reason, the agreement specifically notes that the Government is not restricted from using such "duplicated" emails that were produced by "independent sources." (Bakhshi Sev. Br. Ex. H at 2). The defendants are similarly free to use these documents at trial. And the overwhelming majority of the documents from the email account that the Government anticipates actually using at trial fall into this category of redundant documents provided by other sources.

The Government made the limited value of the email account clear to Bakhshi's counsel during negotiations. Specifically, the Government identified only 27 emails that it did not have from other custodians that it *might* be interested in using in its case-in-chief at trial. And ultimately the Government determined that none of those emails was of high significance to the Government's case and waived their use. (*See* Bakhshi Sev. Br. Ex. H at 3) (listing the 27 documents identified by the Government).

Thus, based on these considerations, the Government determined that litigation over an email account that the Government had little need or interest in using at trial was simply a misuse of resources. And as documented in the agreement, the parties agreed that it was not worth consuming the court's resources on this topic—of course, Bakhishi did not mention that he intended to spend the court's time on this issue by using it to backdoor a severance argument.

In any event, the law does not support Bakhshi's argument for severance.

Bakhshi cites a single out-of-circuit case to argue that severance is appropriate where evidence is suppressed as to only one defendant. (*See* Bakhshi Sev. Br. at 18). Setting aside that Bakhshi self-surrendered his right to pursue a suppression motion and that the evidence he characterizes as "suppressed" is so only of his own orchestration—Bakhshi is incorrect under the law. The Third Circuit has held that "the mere possibility" that "some evidence may be admitted against one defendant which is inadmissible against another is not in itself a sufficient reason for multiple trials." *United States v. Kenny*, 462 F.2d 1205, 1218 (3d Cir. 1972). Indeed, "[t]he prospect that certain evidence will be admissible against one defendant but not against another is a feature of *all* joint trials." *Id.* (emphasis added). That is why "Rule 14 commits to the sound discretion of the trial court the balancing of the inconvenience to the Government and the judicial process of numerous separate trials against the inconvenience to defendants of seeking appropriate limiting instructions." *Id.*; *see also Dickens*, 695 F.2d at 779 (citing *Kenny*).

Bakhshi claims it is "not speculative" that Parmar will seek to admit materials from the email account at trial—again predicting with certainty a decision that is not in his purview but that, according to him, requires severance. (Bakhshi Sev. Br. at 19). While Bakhshi's briefing does provide Parmar with a near roadmap for how to use this subset of materials that Bakhshi claims he shouldn't have access to, *see* Bakhshi Sev. Br. at 19-20, Bakhshi also concedes that he would intend to object to the use of such materials at trial (again though, predicting in this hypothetical scenario that the hypothetical objection would be rejected by the Court). (*Id.* at 20).

But the fact that the Government only identified a handful of documents unique to the email account that it was even considering using at trial casts doubt on Bakhshi's characterization of the account as a veritable gold-mine for Parmar. Similarly, Bakhshi's professed concern about Parmar's use of the documents is undermined by the fact that Bakhshi never requested that the Government claw back any documents from Parmar.[16]

Finally, as a basic matter, Bakhshi again avoids an obvious solution to his concerns. The core issue he raises is that he negotiated away his own ability to use documents from the email account. But revealingly, Bakhshi has never asked the Government to consider letting him out of or revising this provision (presumably because he knew that agreeing to this provision would bolster his anticipated severance motion).[17] Indeed, the agreement allows for the parties to modify the terms "in writing, with the consent and signatures" of the parties, and the implied backup remedy is seeking relief from the Court. (Bakhshi Sev. Br. Ex. H. at 4).

To be clear—the Government is not reflexively offering to let Bakhshi out of

---

[16]  In addition, Bakhshi's claim that the jury learning of the existence of the agreement from Parmar's counsel would be prejudicial is particularly unmoving given that the agreement is of his own initiation and making; in any event, Bakhshi could certainly move to exclude mention of it.  Bakhshi also could move to preclude Parmar from using emails from the account that Bakhshi believes are irrelevant or otherwise inadmissible.

[17]  There are various terms Bakhshi could have proposed in the agreement, but did not, to address the concerns he now raises about Parmar's potential use of the emails at trial.  As just one example, he could have sought an exception to the general prohibition against his use of the emails to rebut any evidence Parmar presents that is unique to the email account. There are similar exceptions in the agreement to the restrictions on the Government's use of the emails.  This is not to suggest the Government would have agreed to those terms, but only to highlight that the history of the agreement and its final terms undercut the credibility of Bakhshi's complaints about unfairness and prejudice associated with a joint trial.

40

this provision of the agreement.  Such a result would leave the Government as the only party providing consideration for the agreement and is inherently unfair.  But Bakhshi's strategy to file a motion for severance rather than confer with the Government reveals the true intent behind his claims: to take advantage of the agreement as another path to severance, rather than a genuine effort to ensure a fair trial.  And while, as set forth above, Bakhshi's severance position is not supported by the law, should the Court have concerns about prejudice that cannot be remedied by appropriate limiting instructions and *in limine* rulings, the logical solution would be for the parties to revisit the agreement—not for the Court to hold two separate, several weeks long, nearly identical trials.

## II.   THE COURT SHOULD DENY BAKHSHI'S MOTION TO DISMISS THE SUBSTANTIVE SECURITIES FRAUD COUNT BECAUSE THE INDICTMENT ALLEGES THE ELEMENTS OF THE OFFENSE AND COMPLIES WITH RULE 7.

Bakhshi asks the Court to dismiss Count Two of the indictment because, according to him, it "does not allege any materially false statements, omissions, or wrongful conduct" by him in connection with the Go-Private Transaction, attributes actions collectively to the defendants without identifying "which defendants committed which actions," and fails to allege that the Go-Private Transaction was a domestic transaction covered by the federal securities laws.  (Bakhshi Br. at 6).  None of these arguments has merit.  The indictment sufficiently alleges: (1) the essential elements of securities fraud; (2) that the fraud involved a scheme built on deception, lies, and manipulation and was carried out by Parmar, Bakhshi, and their co-conspirators; and (3) that the fraud was committed in connection with a domestic

transaction.  Nothing further is required.

### A.   Applicable Legal Standards.

An indictment must contain only a plain, concise, and definite written statement of the essential facts constituting the offense charged.  Fed. R. Crim. P. 7(c)(1).  "[T]he Federal Rules were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure.  [D]etailed allegations ... surely are not contemplated by Rule 7(c)(1)[.]"  *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quotations and citations omitted).  An indictment is sufficient, therefore, so long as it (1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.  *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (quotations and citation omitted).  Further, no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.  *Id.* (quotations and citation omitted); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974) (similar standard under Constitutional requirements).  A defendant may contest the sufficiency of an indictment on the basis that it does not charge an essential element of the crime.  *United States v. Stock*, 728 F.3d 287, 292 (3d Cir. 2013) (citing *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012)); Fed. R. Crim. P. 12(b)(3)(B).

In evaluating a motion to dismiss, the court must accept as true all factual allegations in the indictment. *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). Dismissal under Rule 12(b)(3) "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges." *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d Cir. 2000). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011) (quotations and citation omitted).

## B.   Count Two Sufficiently Alleges Securities Fraud.

Count Two charges the defendants with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5. The statute prohibits using any manipulative or deceptive device in connection with the purchase or sale of any security in contravention of rules prescribed by the Securities and Exchange Commission. *United States v. O'Hagan,* 521 U.S. 642, 651 (1997)).

Count Two tracks the statutory language, including alleging that the defendants committed securities fraud by employing devices, schemes and artifices to defraud; making material misstatements or omissions; and engaging in acts, practices, and courses of business which operated as a fraud and deceit, all in connection with the Go-Private Transaction. *See* Indictment, Count Two, ¶ 2; 15 U.S.C. §§ 78j(b), 17 C.F.R. § 240.10b-5. And it incorporates by reference the allegations of the conspiracy count, which set forth in detail the nature of the fraud and the manner and means through which the defendants carried it out. Finally,

Count Two expressly alleges that the defendants violated Section 10(b) by "engaging in deceptive and fraudulent acts upon purchasers of Class A Units of a company affiliated with Company A in connection with the Go-Private Transaction[.]"  *Id.*

Despite these clear allegations, Bakhshi claims that Count Two is flawed because it does not expressly identify any materially false statements or omissions by him.  (Bakhshi Br. at 7).  He's wrong.

First, and as explained above, the flexible criminal pleading standards do not require the Government to allege with precision every misstatement, omission, or other deceptive action that supports the charge.  Bakhshi's misguided effort to convince the Court that such detail is required seeks to substitute those flexible standards for their more stringent civil counterparts.  But "in a criminal case, an indictment is not required to meet the heightened pleading standards operative in a civil case."  *United States v. Schiff*, 538 F. Supp. 2d 818, 829-30 (D.N.J. 2008), *aff'd*, 602 F.3d 152 (3d Cir. 2010).

Indeed, Bakhshi cites a host of civil securities fraud cases that analyzed whether the allegations in civil pleadings were sufficiently detailed to avoid dismissal under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  (Bakhshi Br. at 7, 8, 10, 11) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1431 (3d Cir. 1997) (reviewing district court decision to dismiss securities fraud civil complaint under FRCP 12(b)(6) and 9(b)); *In re Galena Biopharma, Inc. Sec. Litig.*, Civ. No. 17-929, 2019 WL 5957859, at *10 (D.N.J. Nov. 12, 2019) (granting motion to dismiss complaint for failure to state a claim pursuant to Rule 12(b)(6) and 9(b), as well as

the Private Securities Litigation Reform Act of 1995); *Takata v. Riot Blockchain, Inc.*,
Civ. No. 18-02293, 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020) ("Presently before
the Court are seven separate motions brought by Defendants to dismiss the
Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil
Procedure."); *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997) (same); *City of Edinburgh
Council v. Pfizer, Inc.,* 754 F.3d 159, 166 (3d Cir. 2014) ("PSLRA's heightened
pleading standards require a *private securities fraud complaint* alleging false or
misleading statements to specify each statement alleged to have been misleading, the
reason or reasons why the statement is misleading, and, if an allegation ... is made
on information and belief, ... state with particularity all facts on which that belief is
formed.") (citing 15 U.S.C. § 78u–4(b)(1)) (emphasis added); *SEC v. Tambone*, 597
F.3d 436 (1st Cir. 2010) (affirming dismissal of civil securities fraud complaint);
*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) (same)).  These cases
should have no bearing on this Court's determination of the sufficiency of County Two
of the indictment.

Second, Bakhshi's argument incorrectly presumes that a defendant can only
commit securities fraud by making *material misrepresentations or omissions* in
connection with a securities transaction.  But that is only one way to commit the
crime.  "The forbidden act may take the form of a fraudulent scheme, a false
statement of material fact or material omission, or a fraudulent act or practice."
*United States v. Rigas*, 281 F. Supp. 2d 660, 667 (S.D.N.Y. 2003).  Section 10(b) and
Rule 10b–5, then, forbid "not only fraudulent schemes, but other fraudulent activities

that are connected to the purchase or sale of any security, which may be generally described as 'transactions.'" *Id.* (quoting *United States v. Dioguardi,* 492 F.2d 70, 83 (2d Cir. 1974)).   Given the multiple ways one can violate Section 10(b), the Third Circuit has declined "to dictate an inflexible rule regarding the allowable unit of prosecution in a securities fraud case," in part because the federal securities legislation is to be construed "flexibly to effectuate its remedial purpose," not "technically and restrictively." *United States v. Haddy*, 134 F.3d 542, 548-49 (3d Cir. 1998) (citing *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195 (1963)).

To be clear, Bahkshi could have violated (and did violate) Section 10(b) even if he did not personally make material misrepresentations or omissions to the victims, so long as he participated in the scheme or artifice to defraud and/or the "act practice, or course of business" that operated as a fraud.   17 C.F.R. § 240.10b-5(c).   The indictment clearly alleges that he did just that.   For instance, the indictment alleges that the defendants (including Bakhshi) orchestrated sham acquisitions and created various false and fraudulent documents to artificially inflate the value of Company A and induce the Private Investment Firm and the lenders to fund the Go-Private Transaction.   *See* Indictment, ¶ 4(b), (j)-(l).   Accordingly, Bakhshi's attack against Count Two for not alleging specific misrepresentations or omissions by him is misplaced and without merit.[18]

---

[18]   Relately, Bakhshi's assertion that "the indictment contains no allegations that [he] knew of, and participated in, the alleged scheme to defraud in any way" cannot be squared with the plain language Counts One and Two.   (Bakhshi Br. at 8).

The two criminal cases Bakhshi cites for the proposition that the indictment must identify specific material misstatements or omissions by the defendant—*United States v. Scarfo* and *United States v. Schiff*—are inapposite.  (Bakshi Br. at 7).  Neither case held that a securities fraud indictment must always allege particular material misrepresentations or omissions.  Those cases simply involved schemes based on misrepresentations and omissions.  *See Scarfo*, Crim. No. 11-740, 2013 WL 632228, *3 (D.N.J. Feb. 19, 2013) (securities fraud charges based on the defendant's concealment of control over corporate entity and omissions of that information and other material facts in that entity's SEC filings); *Schiff*, 602 F.3d at 156 (government's theory of liability under Rule 10b-5 sought to hold the defendant accountable for omissions in quarterly SEC filings based on his and co-conspirator's alleged misstatements in company's quarterly conference calls).

Moreover, *United States v. Hart*, 273 F.3d 363 (3d Cir. 2001), which Bakhshi cites as a "good example" of a detailed securities fraud indictment, is irrelevant. (Bakhshi Br. at 8).  That the Government in that case (and in many others) elected to present a detailed indictment spanning dozens of pages has no bearing in this matter.  After all, an indictment need only contain a plain, concise, and definite written statement of the essential facts constituting the offense charged.  Fed. R. Crim. P. 7(c)(1).

    For the same reasons, Bakhshi's arguments that the indictment improperly attributes to him actions of his co-conspirators and that he cannot be charged under Section 10(b) on the basis of misrepresentations or omissions made by his co-

conspirators are meritless.[19]  Bakhshi again cites a string of civil securities fraud cases based on material misrepresentations and omissions.  (Bakhshi Br. at 11). Here, Bakhshi's liability under Section 10(b) arises not from any individual misrepresentation or omission but, rather, his involvement in a broad and elaborate scheme to defraud investors and lenders using various forms of deceptive and manipulative conduct in connection with the Go-Private Transaction.

### C.  Bakhshi Also Can Be Convicted of Securities Fraud Based on Accomplice Liability or Under the *Pinkerton* Doctrine.

Count Two also charges Bakhshi under the accomplice liability statute, Title 18, United States Code, Section 2.  To establish a violation of Section 2, the Government must prove: "(1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting knew of the commission of the substantive offense and acted with the intent to facilitate it."  *United States v. Huet,* 665 F.3d 588, 596 (3d Cir. 2012) (quoting *United States v. Petersen,* 622 F.3d 196, 208 (3d Cir.2010)).  The "act" element does not require that a criminal defendant participate in each and every element of the offense.  *United States v. Dougherty*, 98 F. Supp. 3d 721, 749 (E.D. Pa., March 31, 2015).  "In proscribing aiding and abetting, Congress used language that comprehends all assistance rendered by words, acts, encouragement, support, or presence, ... even if that aid relates to only one (or some) of a crime's phases or elements."  *Rosemond v. United States*, 572 U.S. 65, 73 (2014)

---

[19] Bakhshi's argument that he cannot be charged under Section 10(b) based on the conduct of his co-defendants also is fundamentally wrong under theories of accomplice liability and the *Pinkerton* doctrine, as discussed further below.  This is another reason why the civil cases he repeatedly cites are not persuasive here.

(quotation marks and citation omitted).  Accordingly, a jury may convict Bakhshi for aiding and abetting Parmar's (or Zaharis's or Chivukula's) violations of Section 10(b) as charged in Count Two—even if he did not assist in every element of the offense.

Similarly, Bakhshi may be convicted of Count Two under the *Pinkerton* doctrine, which "permits the government to prove the guilt of one defendant through the acts of another committed within the scope of and in furtherance of a conspiracy of which the defendant was a member, provided the acts are reasonably foreseeable as a necessary or natural consequence of the conspiracy." *United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (citing *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946)); *see also United States v. Whitted*, 734 Fed. Appx. 90, 93 (3d Cir. 2018) (non-precedential) ("The government may seek a conviction for a substantive criminal offense by introducing evidence that a defendant directly committed the offense or by proceeding on a theory of vicarious liability under *Pinkerton* or aiding and abetting."). These alternate theories of liability further undermine Bakhshi's challenge to Count Two and, standing alone, provide a basis to deny his motion.

### D.  The Indictment Sufficiently Alleges a Domestic Securities Transaction.

Bakhshi's final attack on Count Two is that it does not allege that the Go-Private Transaction was a domestic securities transaction within the reach of Section 10(b). This is incorrect.

Section 10(b) applies to actors who employ "manipulative or deceptive device[s]" in two contexts: (1) transactions involving "the purchase or sale of a security listed on an American stock exchange," and (2) transactions involving "the

purchase or sale of any other security in the United States." *United States v. Georgiou*, 777 F.3d 125, 133-34 (3d Cir. 2015) (citing *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247, 273 (2010)).  Section 10(b) "has no extraterritorial reach." *Id.*

Because Company A's securities were listed on a foreign stock exchange prior to the company's conversion to a private entity, this case implicates the second prong. To determine whether the transaction at issue was a "domestic transaction" under *Morrison*, courts in the Third Circuit "consider 'not ... the place where the deception originated, but [the place where] purchases and sales of securities" occurred. *Georgiou*, 777 F.3d at 133-34 (citing *Morrison*, 561 U.S. at 266).  It is the "location of the *transaction* that establishes (or reflects the presumption of) the [Security Exchange] Act's inapplicability." *Id.* (citing *Morrison*, 561 U.S. at 268).

More specifically, "a securities transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Id.* (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 69 (2d Cir.2012)).  Accordingly, territoriality under *Morrison* turns on "where, physically, the purchaser or seller committed him or herself" to pay for or deliver a security. *Id.* at 136 (citing *United States v. Vilar*, 729 F.3d 62, 77 n. 11 (2d Cir. 2013)).

Facts that demonstrate "irrevocable liability" include the "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* (citing *Absolute Activist,* 677 F.3d at 69, 70); *see also Vilar,* 729 F.3d at

78.   In *Vilar,* the Second Circuit concluded that Section 10(b) applied where: (1) some victims signed investment agreements in the United States; (2) another victim "executed the documents necessary to invest ... in her own New York apartment and handed those documents to a New York messenger"; and (3) one victim sent the money required for opening her account from New York. 729 F.3d at 76–78 (quotation marks and citation omitted).

Bakhshi claims that the indictment "contains no factual allegations pleading irrevocable liability in connection with the Go-Private transaction in the U.S." (Bakhshi Br. at 13).   Not so.   As an initial matter, the indictment says: "The Go-Private Transaction referred to a **<u>domestic</u>** merger transaction, whereby Company A was taken private, that closed on or about January 30, 2017."   (Indictment, ¶ 1(g)) (emphasis added).   This allegation alone (which is incorporated by reference into Count Two) is fatal to Bakhshi's argument since, at this phase and in the context of a motion to dismiss, the allegations in the indictment are taken as true.   Nothing further is required.[20]

Nonetheless, the indictment contains numerous other allegations that demonstrate that the Go-Private Transaction was domestic.   These include that: all of the parties to the transaction were located in the United States (i.e., Parmar and the entities he controlled, the Private Investment Firm, and the Lenders, and

---

[20]  Not surprisingly, Bakhshi has not cited a single case in which a securities fraud count was dismissed on jurisdictional grounds where the indictment alleged that the transaction at issue was domestic.   That is because whether a transaction is domestic is a fact-sensitive issue that should be resolved by the trier of fact.   Indeed, *Georgiou* was a jury trial.   The Third Circuit's decision reviewed the sufficiency of the evidence on which the jury relied in convicting the defendant of securities fraud.   777 F.3d at 133.

Company A was a Delaware corporation) (Indictment, ¶ 1(a)-(f)); many of the acts in furtherance of the scheme occurred in the United States (as either specifically alleged in the particular allegation or generally alleged in introductory sections of the indictment); and the transaction itself is alleged in Count Two to have occurred in the United States ("in the District of New Jersey and elsewhere").  And the evidence at trial will show that nearly all of the relevant conduct in connection with the Go-Private Transaction itself occurred in the United States (all of the deal documents were signed here, the deal was negotiated here, the fraud was orchestrated here, etc.). This evidence will more than satisfy the irrevocable liability standard.   But the Government does not have to satisfy that standard now; the indictment simply has to allege that the transaction was domestic to meet the jurisdictional threshold.   It clearly does that.

The Court should deny Bakhshi's motion to dismiss Count Two.

## III.    THE COURT SHOULD DENY BAKHSHI'S MOTION FOR A BILL OF PARTICULARS BECAUSE THE DETAILED INDICTMENT AND FULSOME DISCOVERY PROVIDE MORE THAN ENOUGH INFORMATION FOR BAKHSHI TO PREPARE HIS DEFENSE AND AVOID UNFAIR SURPRISE.

Bakhshi seeks a bill of particulars, arguing that despite its length and detail, the indictment somehow fails to apprise him of the facts he must be prepared to defend against at trial.  Specifically, Bakhshi complains that the indictment's factual allegations impermissibly lump all defendants together, leaving him left to guess which allegations pertain to him.   He also seeks particulars on how he was "personally enriched" by the fraud since the forfeiture allegations in the indictment

do not include specific property or assets he owns.  (Bakhshi Br. at 14-19).  These arguments have no merit.

As Judge Ackerman once explained, Rule 7(f) "does not require the United States Attorney to furnish a three-dimensional colored motion picture of the prosecution's proof prior to trial." *United States v. Caruso*, 948 F. Supp. 382, 395 (D.N.J. 1996) (citations omitted).  Simply put, Bakhshi's "requests probe too deeply into the Government's theory and method of proof" and disclosure of such facts "is not necessary to inform the defendant . . . of the nature of the charges against [him]." *United States v. Mannino*, 480 F. Supp. 1182, 1185 (S.D.N.Y. 1979).  Furthermore, most of Bakhshi's requests are answered by the detailed indictment, as supplemented by the even more detailed criminal complaint that preceded it, and by the extensive discovery provided—including courtesy discovery not yet required, such as Jencks Act material.

## A.   Applicable Legal Standards.

A bill of particulars is required only when an indictment is too vague to permit the defendant to (a) understand the charges and prepare a defense, (b) avoid unfair surprise, and (c) assert a claim of double jeopardy where appropriate.  *Urban*, 404 F.3d at 771-72.  "Only where an indictment fails to perform these functions, and thereby significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial[,] will we find that a bill of particulars should have been issued." *Id.* (internal citations omitted).  As long as the indictment enables the defendant to understand the accusations against him and the central facts that

the United States will present at trial, a bill of particulars is unwarranted.  *See United States v. Rosa*, 891 F.2d 1063, 1066-67 (3d Cir. 1989); *United States v. Zolp*, 659 F. Supp. 692, 706 (D.N.J. 1987); *United States v. Deerfield Specialty Papers, Inc.*, 501 F. Supp. 796, 809-10 (E.D. Pa. 1980).

"A bill of particulars . . . is not intended to provide the defendant with the fruits of the government's investigation, but is instead intended to give the defendant the *minimum* amount of information necessary to permit the defendant to conduct his own defense." *United States v. Mariani*, 90 F. Supp. 2d 574, 590-91 (M.D. Pa. 2000) (emphasis added) (citing *United States v. Smith*, 776 F.2d 1104 (3d Cir. 1985)); *see also United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991); *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971).  "A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant; or disclose its legal theory." *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003); *see also United States v. Jabali*, Crim. No. 01-801, 2003 WL 22170595, *3 (E.D.N.Y. Sept. 12, 2003) (stating that requests "for exact dates, places, and times in which events occurred … ignore the proper scope and function of a bill of particulars and are to be denied").

A bill of particulars is not only unnecessary, it may have a detrimental effect on the Government's proofs at trial.  A bill of particulars "effectively narrows the government's case at trial in the same way as the formal charging document: 'there

can be no variance between the notice given in a bill of particulars and the evidence at trial.'" *N. Jersey Media Grp. Inc v. United States*, 836 F.3d 421, 429 (3d Cir. 2016) (quoting *Smith*, 776 F.2d at 1111). As a result, district courts are understandably reluctant at the pretrial stage to "unduly freeze [the government] to its proofs at trial." *United States v. Boffa*, 513 F. Supp. 444, 485 (D. Del. 1980).

In addition, the Third Circuit has emphasized that a bill of particulars is unnecessary in those cases where, as here, the Government supplements a detailed charging document with substantial discovery. *Urban*, 404 F.3d at 772; *see also United States v. Munoz*, 736 F. Supp. 502, 504 (S.D.N.Y. 1990) (provision of substantial discovery weighs against ordering bill of particulars). Where "discovery provided by the government fills in the outline of the indictment, the necessity for a bill of particulars declines." *Caruso*, 948 F. Supp. at 393; *United States v. Beech-Nut Nutrition Corp.*, 659 F. Supp. 1487, 1499-1500 (E.D.N.Y. 1987) (government's production of 30,000 documents in discovery "must have answered a great many, if not all, of defendants' requests" for discovery and a bill of particulars); *United States v. Coburn*, 439 F. Supp. 3d 361, 382-87 (D.N.J. 2020) (denying bill of particulars based, in part, on voluminous and detailed discovery provided to the defense, which included "discovery far in excess of what is required by Rule 16 or the case law" such as "prior statements of government witnesses").

**B.    Bakhshi is Not Entitled to a Bill of Particulars.**

The circumstances of this case obviate the professed need for additional clarity with respect to the allegations in the indictment. The indictment provides detailed

information about the nature of the charged scheme and the manner in which it was carried out.  Moreover, discovery in this case has been extensive, and Bakhshi has had at his disposal for some time evidence that will be used by the Government to prove its case.  As explained above, the Government has produced large volumes of documents, including email communications and financial records produced by third parties, as well as numerous law enforcement reports of witness interviews conducted by the Government.

And while "the government cannot rely on the sheer quantity of the documents produced during discovery as an automatic substitute for identifying the charges with the necessary specificity," this general principle does not allow Bakhshi "to use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government when the Indictment, discovery, and other information provided by the government adequately notif[ies Bakhshi] of the charges against [him]."  *United States v. Rigas*, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003).

In addition to the extensive discovery and detailed indictment, Bakhshi previously was charged in a 20-page criminal complaint.  Mag. No. 18-8177, Doc. No. 1.  Although the criminal complaint is not the charging document on which Bakhshi will be tried, it nonetheless lays out the scheme in granular detail.  The complaint cites to dozens of emails, financial records, publicly available information, and other evidence, and contains numerous allegations specific to Bakhshi.  *See*, *e.g.*, Complaint, ¶¶ 6-7, 15, 20, 24, 30, 31, 42, and 53.  The Government will establish at

trial many (if not all) of the facts alleged in the complaint, even though the Government likely can meet its burden of proof with far less.  The detailed complaint that preceded the indictment makes Bakhshi's purported confusion over the nature of the charges and evidence against him even less credible.  *See United States v. Javier*, Crim. No. 120-390, Doc. No. 39 at 1, 9 (E.D.N.Y. March 2, 2021) (reviewing both the criminal complaint and the indictment in determining the defendant had sufficient information about the nature of the charges and denying motion for bill of particulars).

Under these circumstances, Bakhshi now has material well in excess of "that minimum amount of information necessary" for his "*own* investigation" such that "there is no need to order the bill of particulars requested by Defendant." *United States v. Grasso*, 173 F. Supp. 2d 353, 367 (E.D. Pa. 2001) (quoting *Smith*, 776 F.2d at 1111).  Ordering a bill of particulars now "would force the Government to a full stop on the continuing factual development of its case."  *United States v. Williams*, Crim. No. 14-70, 2015 WL 4662706, at *4 (M.D. Pa. Aug. 6, 2015).

Under the foregoing authority, the indictment, discovery, and additional disclosures here clearly "contain[] sufficient factual and legal information for the defense to prepare its case." *United States v. Wabo*, 290 F. Supp. 2d 486, 490 (D.N.J. 2003); *see also United States v. Atwell*, Crim. No. 13-560, 2015 WL 2092687, at *5 (D.N.J. May 5, 2015) ("discovery, combined with the sufficiency of the allegations contained in the Superseding Indictment, negates the need for a bill of particulars").

Nonetheless, Bakhshi complains that the indictment "contains only two sentences that mention [him] specifically," and only one attributes conduct to him, while the "remainder makes specific allegations against the other defendants or attributes conduct collectively to 'the defendants.'" (Bakhshi Br. at 14). He asks for particulars as to which defendants committed each of the specific acts alleged in the indictment, even though those details are revealed in the discovery documents coupled with the lengthy criminal complaint. (Bahkshi Br. at 18-19). Bakhshi's argument for a bill of particulars essentially boils down to a complaint that the indictment is not specific enough *as to him*. But the government is not obligated to "provide specific information regarding the individual Defendants' alleged role in the various aspects of the scheme." *Rigas*, 258 F. Supp. 2d. at 305. *See, e.g., United States v. Cephas,* 937 F.2d 816, 823 (2d Cir. 1991) ("[S]pecific acts need not be alleged with respect to every named defendant, if the indictment is otherwise sufficient and names the other persons involved in the criminal activity."); *United States v. Ferrarini,* 9 F. Supp. 2d 284, 299–300 (S.D.N.Y. 1998) (rejecting demand for bill of particulars detailing defendant's specific role in the scheme and actions taken with respect to mail and insurance fraud counts).

*Rigas* is instructive. There, four defendants were charged with conspiracy, securities fraud, bank fraud, and wire fraud in connection with their control and management of a family owned company that provided cable television services. 258 F. Supp. 2d. at 301-02. The indictment alleged a complex series of fraudulent schemes. Like Bakhshi, two of the four defendants sought particulars regarding their

specific roles in the conspiracy. *Id.* at 303-04. The court denied their motions, finding that the information provided through the indictment and discovery was sufficient. The court distinguished the case from "indictments involving a worldwide criminal conspiracy," such as *United States v. Bin Laden,* 92 F. Supp. 2d 225 (S.D.N.Y. 2000) (which Bakhshi also cites; *see* Br. at 17)[21] or "defendants who are identified as tangential participants in the criminal activity," such as *United States v. Nachamie,* 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (also cited by Bakhshi, Br. at 16). *Id.* at 304. Instead, like this case, *Rigas* involved "a small group of defendants who are alleged to have had intimate involvement with the preparation and carrying out of a series of fraudulent activities over a three-year period." *Id.* at 305.

The cases Bakhshi cites are distinguishable and inapposite. For instance, *United States v. Schiff* involved false statements and omissions by an employee of a pharmaceutical company in analyst calls and in filings with the SEC. (Bakhshi Br. at 14). The opinion references an earlier order issued by the court requiring that the Government provide defendant with particulars relating to specific statements or omissions made on the calls and in filings. *Schiff,* 538 F. Supp. 2d at 825. Because the charges in *Schiff* were tied to specific false statements and omissions, the precise

---

[21]  While the Government acknowledges the scheme charged in this case is complex, it is worlds apart from the complexity of *Bin Laden*, which was "unusually vast." *Id.* at 234. The Indictment there alleged overt acts "that occurred in Afghanistan, Pakistan, the Sudan, Somalia, Kenya, Tanzania, Malaysia, the Philippines, Yemen, the United Kingdom, Canada, California, Florida, Texas, and New York." *Id.* The Indictment "allege[d] activity, occurring over a period of nearly ten years, that ranges from detonating explosives, to training Somali rebels, to transporting weapons, to establishing businesses, to lecturing on Islamic law, to writing letters, and to traveling, as overt acts in furtherance of the charged conspiracies." *Id.* There can be no credible comparison between *Bin Laden* and this case.

details about those statements and omissions were critical. *Id.* ("In both the conspiracy and substantive counts, the indictment charges both express misstatements and omissions to state."). This case, on the other hand, charges a broad and expansive fraud that took various forms, as the indictment explains in detail. And Bakhshi's role in that fraud is made clear in the discovery documents and the criminal complaint that preceded the indictment.

Likewise, *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), also cited by Bakhshi (Br. at 16), involved very different facts than those present here. There, the court required the government to identify for each relevant paragraph of the indictment which co-conspirator performed the specified acts alleged. *Id.* at 31. The court found that information necessary because the indictment referred to actions in furtherance of the conspiracy by a corporate entity, not individual co-conspirators. *Id.* ("Often it is not readily apparent from an indictment who performed acts attributed to corporations, and a bill of particulars is an appropriate way to identify these individuals to help the defendant prepare for trial even when the defendant is the corporation itself … In this case, where the defendant is not the corporation at issue but a third party, the defendant's need for information as to individuals who acted for the corporation is even more compelling."). Those circumstances are not present here.

Bakhshi also cites *United States v. Jones*, Crim. No. 12-400, 2013 WL 5954489, *14 (D. Nev. Nov. 6, 2013), an unpublished, out of circuit, district court decision, to support his contention that "lumping of allegations against all defendants" is

"improper." (Bakhshi Br. at 16). In *Jones*, the court granted a defendant's motion for a bill of particulars because, despite alleging a ten-year conspiracy, the indictment only referenced that particular defendant in two counts. More importantly, though, the defendant credibly argued that it was "extremely difficult to find references to [him] in the voluminous discovery that would reasonably apprise him and his counsel of the conduct in which he allegedly engaged." *Id.* Bakhshi has made no such claim.[22]

Nor could he: the discovery includes scores of emails between Bakhshi and his co-defendants discussing various aspects of the scheme. Those documents, coupled with the detailed criminal complaint and indictment, make this case far different than *Jones*.[23]

---

[22] Instead, Bakhshi complains about the volume of the discovery and states that he should not have to "infer his alleged involvement in this complex fraud through this mass of documents." (Bakhshi Br. at 17). Any claim by Bakhshi that he does not understand the nature of the charges or cannot identify the documents in the discovery that pertain to his conduct would be belied by his defense of the case to date. Indeed, Bahkshi's counsel has made numerous presentations to the Government addressing the merits of the charges against Bahkshi, including reviewing with the Government Bakhshi's purported explanation of various documents the Government believes are inculpatory (many of which are cited in the criminal complaint).

[23] *United States v. Chen*, Crim. No. 05-375, 2006 WL 3898177, at *1–3 (N.D. Cal. Nov. 9, 2006), also cited by Bahkshi (Br. at 16), is distinguishable, too. There, the court granted limited bills of particulars to two defendants in a marijuana manufacturing conspiracy. The case was "factually and legally complex, encompass[ed] numerous alleged conspiracies, and involve[d] dozens of defendants and alleged grow-sites." Yet, with respect to the two counts on which the court granted bills of particulars, the indictment essentially alleged only the statutory charging language with limited details of the underlying criminal conduct. One of those counts, a marijuana conspiracy count, failed to identify the particular marijuana grow sites related to that count. And the second count, charging a money laundering conspiracy, did not identify any particular financial transactions that allegedly connected the defendant to the marijuana conspiracy. Those kinds of deficiencies are not present in the indictment in this case, which includes a comprehensive "manner and means" section and numerous overt acts detailing the fraud.

Finally, Bakhshi is not entitled to a bill of particulars regarding how he was "personally enriched" from the fraud. He argues that a bill of particulars is appropriate because the indictment "seeks forfeiture of property against all defendants" but "does not identify any property or assets held by [him] that the Government claims to derive from the alleged fraud." (Bakhshi Br. at 19-20). It is unclear how any lack of information in the forfeiture allegations limits Bakhshi's ability to prepare his defense. To be sure, the Government is not required to prove the forfeiture allegations to convict Bahkshi of the crimes charged in the indictment. And if the Government cannot establish following conviction that property owned by Bakhshi is subject to criminal forfeiture, then none of his property will be forfeited.

Similarly, "personal enrichment" is not an element of any of the charged offenses. Even though the indictment alleges that the goal of the conspiracy was for the defendants to enrich themselves (hardly a unique or unusual goal in a fraud case), the Government is not required to prove the precise nature and scope of the benefits to any one defendant. Accordingly, Bahkshi is not entitled to a bill of particulars on this issue.[24] *See Coburn*, 439 F. Supp. 3d at 387 (denying request for particulars as to the "personal benefit" the defendant received in connection with foreign bribery

---

[24] While the Government disagrees with Bakhshi's characterizations and his contention that his "alleged involvement in the fraudulent scheme makes no circumstantial sense" because he is not alleged to have received "any proceeds from the fraud," Bakhshi will have the opportunity to make those arguments to the jury. (Bakhshi Br. at 20). They are not, however, appropriate for a bill of particulars. *Coburn*, 439 F. Supp. 3d at 382 ("If there are gaps in the discovery information, those gaps may or may not point to a potential weakness in the government's case. That, however, is a matter for trial, not for a bill of particulars.").

scheme "because this is not an express requirement of the FCPA," even though the goal of the conspiracy alleged in the indictment included benefits to the defendants).

Accordingly, Bakhshi's request for a bill of particulars should be denied.

## IV. THE COURT SHOULD DENY PARMAR'S MOTION TO DISMISS FOR LACK OF VENUE BECAUSE THE INDICTMENT SUFFICIENTLY ALLEGES THAT THE CHARGED OFFENSES OCCURRED IN THE DISTRICT OF NEW JERSEY AND ELSEWHERE.

Parmar argues that the indictment should be dismissed for failure to allege venue. His arguments morph from attacks against the sufficiency of the allegations in the indictment, to challenges to the merits of the Government's venue evidence (a trial issue), to baseless allegations of Government misconduct. The Court should reject all of these arguments as the indictment sufficiently alleges venue in the District of New Jersey. While the Government will present additional venue evidence at trial, the indictment's allegations satisfy the venue pleading standards.

### A. Applicable Venue Standards.

A criminal defendant has a constitutional and statutory right to be tried in the district in which the crime was committed. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999). Congress may prescribe specific venue requirements for particular crimes. *United States v. Auernheimer*, 748 F.3d 525, 532 (3d Cir. 2014) (citing *United States v. Pendleton*, 658 F.3d 299, 303 (3d Cir. 2011)). If Congress has not enacted a specific venue provision for the charged offense, the Court must determine "the place where the offense was committed" or the "locus delicti," by evaluating the "nature of the crime alleged and the location of the act or acts constituting it." *Id.* (citing *United States v. Anderson*, 328 U.S. 699, 703 (1946)).

Under this standard, only "essential conduct elements" can provide the basis for venue. *Id.* at 533.

Continuing offenses, such as the conspiracy charged in Count One of the indictment, that are "begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). A conspiracy offense may be prosecuted in any district where any act in furtherance of the conspiracy by any member of the conspiracy occurred, even if the conspiracy offense does not require proof of an overt act. *Auernheimer*, 748 F.3d at 532; *see United States v. Perez*, 280 F.3d 318, 329-36 (3d Cir. 2002) (applying that rule to prosecution under 21 U.S.C. § 846, which does not require proof of an overt act); *United States v. Robinson*, 167 F.3d 824, 829-30 (3d Cir. 1999) (same).

Thus, "venue can be established wherever a co-conspirator has committed an act in furtherance of the conspiracy." *Auernheimer*, 748 F.3d at 533 (quoting *Perez*, 280 F.3d at 329). That is true even if the acts in question are performed by individuals or entities who are not part of the conspiracy, so long as one of the conspirators caused them to occur. *See, e.g., United States v. Gonzalez*, 683 F.3d 1221, 1225 (9th Cir. 2012) ("A conspirator acting alone, with an unwitting third party or with a government agent, may take acts in furtherance of the conspiracy sufficient to support venue."); *United States v. Bradley*, 644 F.3d 1213, 1254 n. 87 (11th Cir. 2011) ("To satisfy the venue requirement, an overt act may be committed by any

conspirator, anyone who aids or abets a conspirator, or anyone a conspirator causes to act.").

With respect to Count Two, Congress has enacted a specific venue provision for securities fraud offenses.  Such offenses may be prosecuted in any district "wherein any act or transaction constituting the violation occurred."  15 U.S.C. § 78aa.  This provision is "manifestly broad," and simply requires that "any act or transaction constituting the violation" has taken place in the pertinent district. *United States v. Johnson*, 510 F.3d 521, 525 (4th Cir. 2007) (quotation marks and citation omitted).  The "venue sustaining act need not constitute the core of the alleged violation," but only had to be material to the charged offense.  *Id.* (quotation marks and citation omitted).

For purposes of pleading venue in an indictment, the government need only "allege venue 'without a facially obvious defect.'"  *United States v. Menendez*, 137 F. Supp. 3d 688, 694 (D.N.J. 2015), *aff'd on other grounds*, 831 F.3d 155 (3d Cir. 2016) (quoting *Perez*, 280 F.3d at 327).  "Courts have held that, 'as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied.'"  *Id.* (quoting *United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006)); *see also United States v. Mendoza*, 108 F.3d 1155, 1156 (9th Cir. 1997) ("[O]nly the indictment may be considered in pretrial motions to dismiss for lack of venue, and . . . the allegations must be taken as true.") (internal citations omitted).  Indeed, "although criminal defendants have a right to be tried in a proper forum, they have no right to be charged with the proper venue."  *Stein*, 429 F. Supp.

65

2d at 643 (citing 1 Charles Alan Wright, Federal Practice and Procedure: Criminal 3d § 125, 572-73 (1999)).

Accordingly, so long as venue is properly alleged in the indictment, as it is here, it is an issue to be resolved at trial.  And, while venue is important, it is not an element of any crime and does not require proof beyond a reasonable doubt.  Rather, the Government need only prove venue by a preponderance of the evidence. *Auernheimer*, 748 F.3d at 533 (citing *United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009)).  "Ordinarily, venue is a question of law for the court to determine." *Menendez*, 137 F. Supp. 3d at 694 (citing *United States v. Taylor*, 559 F. Appx. 122, 126 (3d Cir. 2014)).  If the defendant objects to venue and raises a "genuine issue of material fact" before the close of the prosecution's case-in-chief at trial, the Court has discretion to instruct the jury to decide the question.  *Id.*

### B.    The Indictment Sufficiently Alleges Venue.

The Indictment plainly alleges in Count One that the conspiracy took place "in the District of New Jersey and elsewhere," and includes specific overt acts that "were committed in the District of New Jersey and elsewhere."  (Indictment ¶¶ 2, 5(a)-(g)). Counts Two and Three contain similar language.  These allegations, standing alone, are sufficient to survive any pretrial efforts to challenge this case on venue grounds.

Notably, in *Menendez*, the court denied the defendant's motion to dismiss a count of the indictment on venue grounds based upon a similar allegation in the indictment.  *Menendez*, 137 F. Supp. 3d at 694.[25]  Specifically, the count of the

---

[25]  The Third Circuit in *Menendez* affirmed the district court's decision denying the defendant's motions to dismiss the indictment, which involved numerous issues in addition

indictment at issue tracked the language of the statute that it charged (18 U.S.C. § 1001(a)(1)) and alleged that the offense took place "in the District of New Jersey and elsewhere." *Id.* The court reviewed allegations from other sections of the indictment that explained the offense, namely, that the defendant had failed to disclose reportable gifts he had received from a third party, and found that "read naturally," the indictment charged the defendant with filing reports that did not contain the required disclosures "in the District of New Jersey and elsewhere." *Id.* Similarly, the indictment in this case, "read naturally," alleges that Parmar his co-conspirators engaged in an elaborate scheme to defraud the investors and lenders in connection with the Go-Private Transaction through various fraudulent means, "in the District of New Jersey and elsewhere."[26]

As noted in *Menendez*, "multiple courts have held this language is sufficient to withstand a motion to dismiss an indictment for lack of venue." *Id.* at 695 (citing *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1060 (9th Cir. 2000) (holding that

---

to a venue challenge. *Menendez*, 831 F.3d at 159. The court noted that a denial of a motion to dismiss for lack of venue is not immediately appealable and that the defendant could only have raised the issue as a petition for a writ of mandamus to transfer the case to a different district, which he did not pursue. *Id.* at 175. Nonetheless, the court noted that if the defendant had pursued such a petition, it would have been denied because the indictment alleged that the defendant violated 18 U.S.C. § 1001 when he concealed or covered up material facts "in New Jersey" before he filed his financial disclosures. *Id.* The court observed that, "'at the motion to dismiss stage, the District Court had to accept as true all allegations in the indictment, regardless of its uncertainty as to how the Government would prove those allegations at trial.'" *Id.* (quoting *Bergrin*, 650 F.3d at 270 n.8).

[26] The indictment also alleges that three of the four defendants were residents of New Jersey during the time-period of the scheme and that at least one meeting in furtherance of the conspiracy occurred in New Jersey (Indictment ¶¶ 1(a)-(c), 5(g)). These specific allegations further demonstrate that the indictment adequately pleads venue, even if Parmar disputes them.

an indictment charging defendant with being a deported alien found in the United States properly alleged venue in the Southern District of California because it stated that he was "found" in the Southern District of California and "[o]n its face, therefore . . . alleged proper venue because it alleged facts which, if proven, would have sustained venue in the Southern District of California."); *United States v. Nicolo*, 523 F. Supp. 2d 303, 320 (W.D.N.Y. 2007), *aff'd*, 421 F. Appx. 57 (2d Cir. 2011) ("[T]he Government's burden is satisfied with regard to pleading venue by alleging that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information."); *United States v. Bellomo*, 263 F. Supp. 2d 561, 579 (E.D.N.Y. 2003) (indictment alleging that offenses occurred "within the Eastern District of New York and elsewhere, sufficed to sustain it against this pretrial attack on venue"); *United States v. Szur*, Crim. No. 97-108, 1998 U.S. Dist. LEXIS 3519, at *9 (S.D.N.Y. Mar. 20, 1998) ("On its face, the Indictment alleges that the offense occurred in the Southern District of New York and elsewhere, which is sufficient to resist a motion to dismiss"); *Stein*, 429 F. Supp. 2d at 643-44 (explaining that indictment's allegation that defendants attempted to evade income tax "in the Southern District of New York and elsewhere . . . alone would have been sufficient" to establish venue.)). Given these well-settled principles, there is no merit to Parmar's venue challenges.

Further, while the Government will demonstrate at trial that Parmar and his co-conspirators performed "essential conduct elements" of the charged offenses in New Jersey, *Auernheimer*, 748 F.3d at 533, the indictment does not have to allege

the specific details of all of those actions.[27]   Thus, Parmar's argument that venue is

not constitutionally permissible in the District of New Jersey because the indictment

fails to allege facts that could satisfy the standard articulated in *Auernheimer* is

misplaced.  (Parmar Br. at 6) ("As there is zero evidence that any 'essential conduct

element' underlying the instant indictment took place in the District of New Jersey

… the indictment cannot lie in this venue and must be dismissed in its entirety.").

To be sure, *Auernheimer* looked beyond the text of the indictment and analyzed

the merits of the Government's trial evidence to determine that the conspiracy and

identity fraud offenses at issue in that case lacked sufficient contacts with New Jersey

to justify venue in this district.  *Auernheimer*, 748 F.3d at 534-36.  Nothing in

*Auernheimer* suggests that the essential conduct element standard must be met at a

pretrial, motion to dismiss phase or in the indictment itself.  Parmar has not provided

any authority to the contrary.

For the same reason, Parmar's other arguments aimed at the indictment's

alleged venue omissions are irrelevant.  Specifically, Parmar claims that Counts Two

and Three make "no effort whatsoever, beyond the vague language of 'in the District

of New Jersey and elsewhere' to establish venue[.]"  (Parmar Br. at 5).[28]  He also

---

[27] It should be noted that, at trial, the essential conduct elements standard may not apply to the substantive securities fraud count of the indictment since that count is governed by a specific statutory venue provision, 15 U.S.C. § 78aa.  *See Auernheimer*, 748 F.3d at 532 ("Congress may prescribe specific venue requirements for particular crimes … [w]here it has not, as is the case here, we must determine the crime's locus delicti.").

[28] Parmar contends that the meeting described in Paragraph 5(g) of the indictment did not, in fact, occur in New Jersey as alleged.  He assumes, incorrectly, that such meeting was the only basis for venue in New Jersey, and that the Government must have presented inaccurate information to the grand jury either through "careless conduct" or "active dishonesty."

claims that neither Company A nor the Operating Company maintained bank accounts in New Jersey. (*Id.* at 6). These arguments boil down to a common claim that the indictment does not allege the specific location of the various acts that make up the crime. But, as explained above, that is not the standard that this Court must apply in determining the sufficiency of the indictment's venue allegations. *See Menendez*, 137 F. Supp. 3d at 693-94; *Stein*, 429 F. Supp. 2d at 643-44 ("An indictment … is sufficient despite the absence of any statement as to the place of the crime[.]").

Since the indictment makes clear in each count that the offenses occurred in the District of New Jersey, among other places, the Government has sufficiently alleged venue. The Court should deny Parmar's motion.

## V.   THE COULD SHOULD DENY PARMAR'S MOTION TO DISMISS THE CONSPIRACY COUNT AS DUPLICITOUS BECAUSE IT ALLEGES A SINGLE SCHEME TO DEFRAUD.

Parmar argues that the conspiracy count is duplicitous because, according to him, it alleges "multiple and conflicting conspiracies." He contends the goal of the conspiracy is "inconsistent" with and contradicted by the alleged manner and means section, and that the dates of the conspiracy count do not line up with the first and last overt acts or the date range of the substantive securities fraud count. Many of

---

(Parmar Br. at 5). These baseless allegations of government misconduct are a common theme in Parmar's motions and are liberally sprinkled throughout his brief. The Government will address those claims in more detail in the appropriate sections of this brief; suffice to say, though, that the Government acted appropriately at all times before the grand jury and in all other aspects of this investigation and prosecution. Moreover, the Government is not relying on the Hazlet, New Jersey meeting in Paragraph 5(g) as the sole basis for venue in this case.

Parmar's arguments are premised not on the allegations in the indictment—the only relevant point of reference on a motion to dismiss like this one—but on his own misguided view and interpretation of the merits of the case and substantive evidence. At bottom, the conspiracy count clearly and concisely alleges a single scheme to defraud. There is nothing confusing or contradictory about it. The Court should deny Parmar's motion.

"Duplicity is the joining of two or more distinct offenses in a single count, so that a general verdict does not reveal exactly which crimes the jury found the defendant had committed." *United States v. Gomberg,* 715 F.2d 843, 845 (3d Cir.1983), *cert. denied,* 465 U.S. 1078 (1984) (citation omitted). An indictment is not duplicitous in cases like this one where it "does not charge different offenses in the same count, but instead charges different methods of completing the same offense." *United States v. Sourlis,* 953 F. Supp. 568, 572 (D.N.J. 1996).

When considering a motion challenging an indictment as duplicitous, "a court's review is limited because 'the task is not to review the evidence ... to determine whether it would support charging several crimes rather than just one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count.'" *Id.* (quoting *United States v. Mastelotto,* 717 F.2d 1238, 1244 (9th Cir.1983)). "The question for review is simply whether the indictment may be read to allege a single unified scheme in each count." *Id.*[29]

---

[29] The Government will prove at trial that the defendants engaged in a single conspiracy, which exists where there is evidence of: (1) a common goal among the conspirators; (2) an agreement to obtain an ongoing benefit for the conspirators through ongoing orchestrated activity; and (3) overlap among the coconspirators. *United States v. Kelly*, 892 F.2d 255, 259-

The indictment plainly alleges a single conspiracy.  It alleges that between May 2015 and September 2017, the defendants conspired to commit securities fraud through an elaborate scheme to defraud the Private Investment Firm and others out of hundreds of millions of dollars in connection with the Go-Private Transaction.  *See* Indictment, ¶¶ 2, 4(a).  The goal of the conspiracy as alleged in the indictment is straightforward: for the defendants to enrich themselves by falsely inflating the value of Company A through fraudulent means to make it a more attractive acquisition target at prices that far exceeded its true value.  And, as alleged in the indictment, it worked–the defendants, led by Parmar, orchestrated the Go-Private Transaction at a price that far exceeded the true value of Company A, resulting in substantial illicit gains.

The manner and means section of the indictment sets forth "different methods of completing the same offense," *Sourlis,* 953 F.Supp. at 572, by laying out in clear terms the fraudulent tactics the defendants employed to create a false and misleading picture of Company A's value and financial standing.  All of the allegations in the conspiracy count tie into the same common goal and core scheme object: to artificially inflate the value of Company A through lies and deception to induce unsuspecting victims to invest in it.  Accordingly, the indictment alleges "one unitary scheme to defraud." *Id.* at 574.

---

60 (3d Cir. 1989).   This is a factual issue and is primarily a question for the jury.  *United States v. Rodriguez*, 509 F.2d 1342, 1348 (5th Cir. 1975).  For now, the indictment sufficiently alleges one conspiracy.

Nonetheless, Parmar argues that the conspiracy count "sets forth internally contradictory and inconsistent goals for the supposed single purpose of the conspiracy." (Parmar Br. at 20-21). Without citing to the indictment, Parmar claims that it alleges a "unified goal to inflate the value of the company in the eyes of the Lenders and the Private Investment Firm" yet seeks "to simultaneously argue that the defendants were using the company's funds for personal gain and actually decreasing Company A's value[.]" (Parmar Br. at 22). This argument fails. The indictment does not allege that the defendants used company funds for personal gain; instead, it alleges that the defendants engaged in a variety of fraudulent activities to inflate Company A's value, including creating fake bank statements, phony customer revenue, and manufacturing sham acquisitions by Company A. *See* Indictment, ¶ 1-5.

Parmar also makes numerous arguments based on the dates and timing of the conspiracy count. First, he claims that the conspiracy is alleged to have begun in May 2015, but the defendants did not start engaging with the Private Investment Firm and/or the Lenders until early 2016. (Parmar Br. at 22-23) ("Thus, by its own terms, the Indictment alleges a group of individuals sharing a unified purpose to mislead and defraud an organization with which it had no prior relationship and of which the group had no reason to even be aware.").

As an initial matter, the indictment does not allege when the defendants began engaging with the victims, only that the scheme took place between the charged date range. Parmar's argument is based on his interpretation of evidence that is not before

the Court at this pretrial, motion to dismiss phase.  But his argument is irrelevant in any event.  The principal goal of the scheme was to artificially and fraudulently inflate Company A's value to make it a more attractive acquisition or investment target; the defendants' unlawful actions in 2015 (including the sham acquisitions) helped them achieve that goal, which they realized later in time in 2016 and 2017 through the Go-Private Transaction.  For example, as alleged in one of the overt acts (indictment, ¶ 5(c)), the defendants touted the sham acquisitions from 2015 in their June 2016 presentation to induce the victims into the Go-Private Transaction.  Neither the law of conspiracy, nor the allegations in the indictment, requires the Government to prove that the defendants pre-designated a "carefully selected victim" (Parmar Br. at 23) before they began their scheme.  Parmar has cited no authority for that proposition.

Second, Parmar points to the difference in the date ranges of the conspiracy count and the substantive securities fraud count.  That argument suffers from the same basic flaw: it assumes that the conspiracy began and ended with the Go-Private Transaction itself, and ignores the multiple months before in which the defendants fabricated Company A's records, announced bogus acquisitions, and took other steps to paint a false and misleading picture of Company A.  That is not how the indictment alleges the crime, or how the Government is required to prove it.

Likewise, Parmar challenges the September 2017 end date of the conspiracy since the Go-Private Transaction closed in January 2017.  (Parmar Br. at 24).  While the Court's analysis is limited to the allegations in the indictment, the Government

will prove at trial that Parmar remained involved in the management of Company A through September 2017 and took numerous steps during that time to conceal the fraud and continue to reap its benefits.  Thus, there is no merit to Parmar's assertion that the conspiracy end date is "random and internally illogical[.]"  (*Id.*).[30]

Third, Parmar attempts to use the dates of the overt acts alleged in the indictment to restrict the scope and timing of the conspiracy count.  He complains that "the first overt act alleged supposedly takes place … eight months after the conspiracy began" and the final overt act takes place "on July 29, 2016, although the conspiracy purportedly continues for more than a year."  (Parmar Br. at 23-24).  This argument reflects a fundamental misunderstanding of criminal pleading requirements and the law of conspiracy.

"It is well settled that the government can prove overt acts not listed in the indictment."  *United States v. Schurr,* 794 F.2d 903, 907 n. 4 (3d Cir. 1986); *United States v. Adamo,* 534 F.2d 31, 38 (3d Cir. 1976) ("There is general agreement that the Government is not limited in its proof at trial to those overt acts alleged in the indictment.").  Likewise, "a conspiracy indictment need not allege every overt act

---

[30] When one of the goals of the conspiracy is to make money, "the jointly undertaken scheme continues through the conspirators' receipt of their anticipated economic benefits," and "efforts to secrete or launder moneys gained from a scheme for monetary gain, and to safeguard them from discovery or recovery, are to be considered acts in furtherance of the conspiracy, rather than mere acts of concealment of the commission of crime." *United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005). Further, "communications 'designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no [such communication] had taken place'" fall into this category, "as they allow the conspirators to 'reap ... and keep ... economic gains from their conspiracy.'" *United States v. Jergensen*, 797 Fed. Appx. 4, 6 (2d Cir. 2019) (quoting *United States v. Lane*, 474 U.S. 438, 451–52, (1986)).

committed in furtherance of the conspiracy." *United States of Am. v. Lam Lek Chong,* 544 F.2d 58, 63 (2d Cir. 1976). So the Government can, and will, present evidence of overt acts in furtherance of the conspiracy both before and after the few alleged in the indictment. After all, "to establish a conspiracy, the government need show only that one of the conspirators engaged in a *single overt act* to further the conspiracy." *United States v. Dean*, 55 F.3d 640, 651 (D.C. Cir. 1995) (emphasis added).

Finally, Parmar argues that the indictment fails to "make clear" how the assets identified in the forfeiture allegation "could possibly fulfill the claimed goal of the conspiracy[.]" (Parmar Br. at 21). It is unclear how the indictment's forfeiture allegations in any way could render the conspiracy count duplicitous, regardless of whether those assets can be traced to the fraud.[31] As explained in Section IX, those assets were properly seized pursuant to a judicially authorized seizure warrant and are included in the indictment for notice purposes. Parmar's forfeiture-related arguments are meritless, both in this context and more generally as an attack on the forfeiture section of the indictment.

Because the conspiracy count alleges a single, unified scheme to defraud, the Court should deny Parmar's motion.

---

[31] Parmar's assertions about the identities of the victims, and the Private Investment Firm in particular, also are confusing. (Parmar Br. at 20). It is clear from the charging documents and the discovery produced to the defendants that the Private Investment Firm is a victim of the fraud alleged in the indictment. The specific identity of that entity also is disclosed in those discovery documents. There can be no serious claim of confusion by Parmar on this issue, nor a credible argument that the indictment is duplicitous due to any issues relating to the identity of the corporate victims.

## VI.   THE COURT SHOULD DENY PARMAR'S REQUEST FOR THE EXTREME SANCTION OF DISMISSAL OF THE INDICTMENT BECAUSE IT IS BASED ON PURE AND UNSUPPORTED SPECULATION OF MISCONDUCT BEFORE THE GRAND JURY.

Despite consistently and loosely deploying such phrases as: "prosecutorial misconduct;" "shocking to the conscience;" "affirmatively misled by the Government's misconduct;" "the Government intentionally misled the Grand Jury;" and "glaring evidence of prosecutorial misconduct … and the extreme likelihood that the Grand Jury was affirmatively misled by that misconduct;" Parmar offers nothing but speculation and conjecture to support these very serious allegations.  That is because they are not true.  Instead, the grand jury found probable cause to support the indictment based on the overwhelming and extensive evidence of fraud involved in this case.  That Parmar simply disagrees with the Government's allegations and disputes the charges does not mean that the grand jury was misled or deceived, or that the indictment is "invalid."  Parmar will have his day in court and can present his defenses–for now, there is no basis to disturb the indictment or the grand jury's lawful and appropriate exercise of its authority in returning it.  Parmar's motion should be denied.

Dismissal of an indictment based on prosecutorial misconduct is an "extraordinary remedy" and is appropriate "only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there was grave doubt that the decision to indict was free from substantial influence of such violations." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255-56 (1988); *see also United States v. Soberon,* 929 F.2d 935, 939–40 (3d Cir. 1991).  A defendant seeking to

dismiss an indictment "bears a heavy burden." *United States v. Kubini*, 19 F. Supp. 3d 579, 615 (W.D. Pa. 2014); *United States v. Birdman*, 602 F.2d 547, 559 (3d Cir. 1979) (dismissal based on prosecutorial misconduct is an "extreme sanction" that should be "infrequently utilized.") (citation omitted).

When faced with a motion to dismiss an indictment based on prosecutorial misconduct before the grand jury, the court first must determine whether misconduct has occurred. *United States v. Martino*, 825 F.2d 754, 759 (3d Cir. 1987). A finding of prosecutorial misconduct requires knowledge on behalf of the prosecutor, or a deliberate act conducted by the government. *See, e.g., United States v. Liciardello*, 93 F. Supp. 3d 365, 368 (E.D. Pa. 2015) ("[t]he Government must know that the testimony at issue is perjured").

Importantly, mere speculation that prosecutorial misconduct may have occurred in the grand jury is insufficient. *United States v. Dowling*, Crim. No. 2017-0035, 2019 WL 1053607, at *4 (D.V.I. Mar. 5, 2019) (denying motion to dismiss indictment due to prosecutorial misconduct based on "only speculative or conclusory statements" regarding whether the Government knew that one of the witnesses presented to the grand jury was being untruthful); *United States v. Eisenberg*, 773 F. Supp. 662, 710 (D.N.J. 1991) (denying motion to dismiss indictment "to the extent it is based on speculation" of prosecutorial misconduct before the grand jury). Nor is such speculation sufficient to warrant disclosure of discovery related to the grand jury proceedings. *United States v. Shane*, 584 F. Supp. 364, 367 (E.D. Pa 1984)

("[C]ourts generally reject unsupported beliefs and conjectures as grounds for disclosure of grand jury materials to defendants.").

If the court finds that misconduct occurred, it must next determine whether the alleged misconduct resulted in prejudice to the defendant. *Bank of Nova Scotia*, 487 U.S. at 263 (a district court may "not dismiss [an] indictment on the basis of prosecutorial misconduct" before the grand jury without making a factual finding that the defendant was prejudiced by such misconduct); *Martino*, 825 F.2d at 759 (holding that in determining whether prosecutorial misconduct occurred before the grand jury which would warrant dismissal of the indictment, "in every case we looked to prejudice"). The requirement of prejudice is excused only in extreme cases, where the "structural protections of the grand jury" have been compromised and remedies other than dismissal would be impractical—such as where the grand jury selection procedure was conducted in a discriminatory manner. *Bank of Nova Scotia*, 487 U.S. at 257; *Soberon*, 929 F.2d at 939-40.

Here, Parmar vaguely asserts that "there is ample ground to believe" that "the evidence presented [to the grand jury] was so sanitized, reduced, and inaccurate that it must inevitably have impaired the integrity of the Grand Jury's investigative function in that the case as presented affirmatively misled the Grand Jury." (Parmar Br. at 8). Of course, Parmar qualifies all of this by acknowledging, as he must, that "the defense has not seen the minutes of the Grand Jury presentation[.]" (*Id.*). Nonetheless, he claims that the grand jury could not have returned the indictment had it been aware of certain evidence he considers exculpatory, namely: (1) certain

financial data that Parmar claims accurately represented the financial condition of Company A and, according to him, was made available to the victims during the due diligence period of the Go-Private Transaction; (2) evidence that the Government contacted one of the Lenders about the Go-Private Transaction and raised concerns before it closed; (3) a shareholder suit in Delaware Chancery Court related to the Go-Private Transaction; and (4) an article published in the Financial Times before the transaction closed that was critical of Company A and questioned some of its prior transactions.

As an initial matter, Parmar's allegations about what was or was not presented to the Grand Jury are "purely speculative, and at this stage are without any factual foundation." *United States v. Fields*, Crim. No. 15-129, 2016 WL 1428113, at *10 (E.D. Pa. April 12, 2016). The Court can and should deny his motion on this basis alone, without further analysis.

Putting aside the guesswork and speculation weaved throughout Parmar's motion, the notion that the above information (collectively or individually) would have precluded the Grand Jury from finding probable cause to support the charges in the indictment cannot be reconciled with the overwhelming evidence of fraud in this case.[32]  As alleged in the charging documents, Parmar and his co-conspirators engaged in numerous categories of blatant and elaborate fraud, from concocting

---

[32] To be clear, the Government disputes Parmar's characterizations of the extent of the exculpatory value (if any) of the evidence he emphasizes in his motion. The Government will address the merits of that evidence at the appropriate time. For now, he has not met his heavy burden of demonstrating misconduct before the grand jury.

phony bank statements, to manufacturing customer revenue in accounting records, to making up operating companies from whole cloth, the evidence demonstrates a relentless level of deception and manipulation. And the deception worked–Parmar and the defendants sent the Private Investment Firm many of these phony documents and records and they relied on those materials in deciding to participate in the transaction. *See* Criminal Complaint, ¶¶ 4, 9; Indictment, ¶ 4(a)-(l).[33]

Finally, as Parmar concedes, the Government has no obligation to present exculpatory information to the grand jury. (Parmar Br. at 7); *United States v. Williams,* 504 U.S. 36, 47 (1992). As a result, a district court may not dismiss an indictment on the ground that the government failed to disclose to the grand jury exculpatory evidence that was in its possession. *Id.* at 55; *United States v. Minerd,* 299 Fed. Appx. 110, 112 n. 1 (3d Cir. 2008). Therefore, even if the Court accepts

---

[33] Parmar's motion–and indeed, much of his anticipated defense–is based on the theory that the victims could not have relied on the fraudulent and incorrect information in the due diligence materials because, according to him, they also had access to accurate information. And without reliance, says Parmar, the Government cannot prove securities fraud. (Parmar Br. at 12, n.6). Putting aside the separate wire fraud count, Parmar's assertions are based on an incorrect assumption that the Government actually has to prove reliance in connection with the securities fraud charges. But the Third Circuit has held in the context of a criminal stock manipulation scheme that reliance is not a required element of securities fraud under Section 10(b), noting that "[n]either the statute nor the rule includes a reliance requirement. Instead, both section 10(b) and Rule 10b–5 prohibit the employment of manipulative and deceptive devices in connection with the purchase or sale of securities." *Haddy*, 134 F.3d at 549; *See also United States v. Stewart*, 728 Fed. Appx. 651, 653 (9th Cir. 2018) ("[T]he criminal fraud statutes do not require the Government to prove reliance"); *United States v. Shkreli*, No. Crim. No. 15-637, 2018 WL 9539774, at *20 (E.D.N.Y. Feb 26, 2018) ("As a threshold issue, in a criminal securities fraud case, the test for materiality is objective – whether or not there is 'a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision, and not actual reliance.'") (quoting *Vilar*, 729 F.3d at 89). In any event, these issues are irrelevant at this pre-trial stage of the proceedings and, regardless, the Government will present evidence at trial that the victims relied on Parmar's and his co-conspirators' material misrepresentations and omissions to their detriment.

Parmar's baseless speculation and his theories about the exculpatory nature of the information he alleges was withheld from the grand jury, he still would not be entitled to the extreme remedy of dismissal of the indictment.

The Court should deny Parmar's motion to dismiss.

## VII.   THE COURT SHOULD REJECT PARMAR'S MERITLESS CLAIMS REGARDING EMAILS THE GOVERNMENT LAWFULLY OBTAINED.

Parmar makes numerous claims and allegations throughout his motions concerning the Government's use of incriminating emails that, according to him, were stolen by private actors from a private web domain he controlled.  He claims that the Government acted improperly in relying on these communications in bringing this case, and that the remedy should be: dismissal of the indictment based on various theories of government misconduct (addressed further below in Section VII); or disqualification of the prosecution team, suppression of the email evidence (though he does not specify which emails), and/or an evidentiary hearing.  Like Parmar's other assertions, these claims have no factual or legal support.  This Court has reviewed and dismissed similar claims in other related proceedings and should do the same here.

### A.   The Government Lawfully Obtained the Subject Emails During its Investigation.

In both the Government's civil forfeiture action, Civ. No. 18-9293-MCA (the "Civil Forfeiture Case"), and Parmar's civil RICO suit, *Alpha Cepheus LLC et al. v. Chu et al.*, Civ. No. 18-14322-MCA (the "Civil RICO Case"), Parmar alleged that private actors "illegally and without authorization" accessed emails from a private

82

web domain he owned and controlled, "constellationhealthgroup.com" (the "Constellation Domain"), in violation of the Stored Communications Act, 18 U.S.C. § 2701.  He continues to press those allegations here, even though the Court rejected nearly identical claims in the Civil RICO Case as "wholly conclusory, and limited to unadorned statements that [the private actors] gained unauthorized access to Parmar's communications," Civ. No. 18-14322, Doc. No. 107 at 20, and noted in the Civil Forfeiture Case that Parmar never alleges "that the Government participated in or directed" the search and collection of the subject emails.  Civ. No. 18-9293, Doc. No. 73 at 3.

The Government commenced this criminal investigation in December 2017, months after the alleged "theft" Parmar asserts.  As explained in the declaration of Ka C. Leung filed in the Civil Forfeiture Case (Civ. No. 18-14322, Doc. No. 68-1), in September 2017, the Private Investment Firm's outside counsel retained a consulting and advisory firm (the "Consulting Firm") to assist it "with multiple investigative, advisory, and restructuring tasks regarding" Company A.  In the course of that work, computer forensics professionals from the Consulting Firm directed the collection of Company A's electronically stored information from servers located in New York, Texas, California, Colorado, and New Jersey, which were maintained by one of Company A's operating companies.  *Id.*, ¶ 6.  Between late September and early October 2017, the Consulting Firm's computer forensics professionals extracted various employees' mailboxes from the operating company's Office 365 environment, including those of Parmar, Zaharis, and Chivukula.  *Id.*, ¶ 7.  Also in October 2017,

the Consulting Firm was granted access to Company A's corporate Dropbox accounts assigned to and used by the defendants.  *Id.*, ¶ 8.  The Government had no interactions, input, or involvement with those ESI collection efforts.

Months later, after the Government began a criminal investigation relating to the fraud charged in the indictment, the Private Investment Firm voluntarily produced documents to the Government, including numerous emails involving the defendants (and the Constellation Domain) in the possession, custody and control of the Private Investment Firm.  The Government subsequently issued grand jury subpoenas to both the Private Investment Firm and Company A and received additional documents.  Those subpoenas sought documents in the possession, custody or control of Company A and the Private Investment Firm relating to, among other things, the Go-Private Transaction.  The subpoenas did not distinguish or single out in any way the Constellation Domain.  The Government has received large volumes of emails and other records from both entities, and many of those emails provide explicit and compelling evidence of the defendants' guilt in this case.

B.    **Even if the Court Accepts Parmar's Conclusory and Speculative Allegations as True for Purposes of this Motion, He is Not Entitled to Relief Under the Fourth Amendment.**

Parmar does not allege that the Government participated in, or directed in any way, the search and collection of the emails at issue (which he does not specifically identify).  Instead, he simply claims that the Government "obtained access" to the emails (Parmar Br. at 16), and that the emails are "tainted" because "it was made clear to both the takers and the Government that the emails constituted stolen

property illegally taken from a privately owned domain[.]" (Parmar Br. at 45). Not surprisingly, Parmar cites no authority to support his creative interpretation of the Fourth Amendment.

At the outset, Parmar has not established a reasonable expectation of privacy over the emails at issue. "A Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001); *Walker v. Coffee*, 905 F.3d 138, 144 (3d Cir. 2018) ("The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy."). He simply alleges without any detail that the Constellation Domain "contained email exchanges between Mr. Parmar and his legal counsel, not just during the period of time alleged by the Government in Count One of the instant indictment, but over several years prior to that." (Parmar Br. at 16).

Parmar cannot demonstrate a constitutionally protected expectation of privacy over the entire Constellation Domain given that he and his co-conspirators used it to send numerous emails in furtherance of the fraud. Moreover, the fact that Parmar used that domain to conduct business on behalf of Company A, and then resigned from Company A and forfeited control of its property and operations, further undermines any reasonable expectation of privacy. Similar circumstances arose in *United States v. Shkreli*, Crim. No. 15-637, 2017 WL 3608252, at *2 (E.D.N.Y. May 16, 2017). There, the court rejected a motion by the former CEO of two companies, MSMB and Retrophin, to suppress MSMB documents produced to the government by

Retrophin, noting that "[b]y the defendant's own admission, as of September 30, 2014, he was no longer serving as CEO of Retrophin, and the company did not begin producing the MSMB material he now seeks to suppress until February 2, 2015." *Id.* As a result, "the defendant had *no* possessory or proprietary interest either in his former office at Retrophin or the digital records that Retrophin accessed from its digital systems, which are essential elements for a defendant asserting a privacy right in the context of a corporate office." *Id.*

Even if Parmar had a reasonable expectation of privacy in the electronic evidence produced to the Government, it is well-settled that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment. *See Burdeau v. McDowell*, 256 U.S. 465 (1921); *Coolidge v. New Hampshire*, 403 U.S. 443, 487-490 (1971); *Walter v. United States*, 447 U.S. 649, 656 (1980). The search-and-seizure provision of the Fourth Amendment does not apply to independent, private actors, like the Consulting Firm, the Private Investment Firm, or Company A. *United States v. Jacobsen*, 466 U.S. 109, 113-14 (1984) (holding that Fourth Amendment search and seizure clause "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official") (quotation marks omitted)); *Johnson v. United States*, 971 F. Supp. 862, 866-67 (D.N.J. 1997).

Thus, "'evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.'" *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir.

86

2003) (quoting *United States v. Kinney*, 953 F.2d 863, 865 (4th Cir. 1992)); *see also Walter*, 447 U.S. at 656 ("[A] wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and ... such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully." (citations omitted)). "Once frustration of the original expectation of privacy occurs, the Fourth Amendmentdoes not prohibit governmental use of the now-private information." *Jacobsen*, 466 U.S. at 117. Rather, the Fourth Amendment "is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id.*

In order to run afoul of the Fourth Amendment, therefore, the Government must do more than passively accept or acquiesce in a private party's search efforts. *United States v. Jarrett*, 338 F.3d 339, 344-45 (4th Cir. 2003). Rather, there must be some degree of Government participation in the private search. Determining whether the requisite agency relationship exists "necessarily turns on the degree of the Government's participation in the private party's activities[.]." *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614-15 (1989) (quoting *Coolidge,* 403 U.S. at 487). The defendant bears the burden of proving that an agency relationship exists. *Jarrett*, 338 F.3d at 344-45.

In *Jarrett,* an anonymous computer hacker provided evidence to law enforcement about the defendant's involvement in child pornography. 338 F.3d at 340-41. The hacker had previously provided information to police that led to the prosecution of another child pornographer, and it was undisputed that the hacker

87

acted with the desire to assist law enforcement and even that the government knew about some of his activities through the earlier prosecution.  *Id.* at 341-42.

In finding that the hacker did not act as an agent of the government, the court reasoned that "the Government must domore than passively accept or acquiesce in a private party's search efforts.  Rather, there must be some degree of Government participation in the private search."  *Id.* at 344.  As the court explained, "simple acquiescence by the Government does not suffice to transform a private search into a Government search."  Rather, "there must be some evidence of Government participation in or affirmative encouragement of the private search before a court will hold it unconstitutional."  *Id.* at 346.  "Passive acceptance by the Government is not enough." *Id.*

Because the Government in this case merely received emails after they had been discovered and collected and did not participate or influence in any way the method of collection or the specific devices and property searched, Parmar simply cannot attribute any alleged privacy violation to the Government.

Notably, this Court correctly observed in an order in the Civil Forfeiture Case that claimants (effectively, Parmar) did not "allege that the Government participated in or directed this electronic search."  Civ. No. 18-09293, Doc. No. 73 at 3.  The Court stated:

> The Court need not determine whether a violation of the SCA occurred. Rather, at issue is whether the Government's use of these emails is conduct that could warrant dismissal, exclusion, sanction, or disqualification. Even assuming *arguendo* the collection of these emails did violate the SCA, Claimants have not demonstrated that the

88

Government's use of these emails would be improper such that sanction or disqualification is warranted.

[*Id.* at 3, n. 3]

The Court should apply the same rationale here and deny Parmar's motions.

### C.   Parmar is Not Entitled to An Evidentiary Hearing.

As an "alternative" to suppression, Parmar seeks an evidentiary hearing "regarding the exact circumstances surrounding the retrieval of the emails and the manner in which they were obtained by the Government." (Parmar Br. at 46). This request suffers from the same flaws as many of Parmar's other motions–it is based entirely on speculation and lacks any factual or legal support.

"The test for granting an evidentiary hearing in a criminal case is substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?" *United States v. Reyeros*, 537 F.3d 270, 284 n. 18 (3d Cir. 2008) (quoting *United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir. 1990)). Evidentiary hearings are not granted as a matter of course, and a district court does not have to hold an evidentiary hearing on a motion just because a party requests a hearing. *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir. 1990); *United States v. Persinger*, Crim. No. 06-4902, 2008 WL 2766154, at *2 (3d Cir. 2008) (not precedential) ("A district court is not always obligated to conduct an evidentiary hearing in conjunction with a motion to suppress, but need only do so if the difference in facts is material, that is, only if the disputed fact makes a difference in the outcome") (quotation marks and citation omitted).

As a result, a defendant is entitled to a hearing only when his moving papers present a "colorable claim" for relief. *United States v. Brink*, 39 F.3d 419, 424 (3d Cir. 1994). To be "colorable," a defendant's motion must consist of more than mere allegations of misconduct. *Voigt*, 89 F.3d at 1067; *United States v. Blackwell*, 954 F. Supp. 944, 964 (D.N.J. 1997). As the Supreme Court has cautioned, "claims that taint attaches to any portion of the Government's case must satisfy the trial court with their solidity and not be merely a means of eliciting" the prosecution's case in advance of trial. *Nardone v. United States*, 308 U.S. 338, 342 (1939). "[A]llegations which are general and conclusory or based upon suspicion and conjecture will not suffice" to meet the *Nardone* standard of "solidity" for ordering an evidentiary hearing. *Cohen v. United States*, 378 F.2d 751, 760 (9th Cir. 1967).

Rather, the defendant must support the motion with sworn factual allegations from a person with personal knowledge of those facts, that, if true, would entitle the defendant to relief. *See Gov't of Virgin Islands v. Martinez*, 780 F.2d 302, 306-08 (3d Cir. 1986) (holding that an evidentiary hearing regarding an alleged *Brady* violation was appropriate when an affidavit submitted by the defendant to the district court raised "genuine issues of material fact") (quoting *United States v. Dansker*, 565 F.2d 1262, 1264 (3d Cir. 1977)); *United States v. Ruggiero*, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993) (holding that a motion to suppress evidence from warrantless search must fail because defendant failed to submit an affidavit based on personal knowledge), *aff'd*, 44 F.3d 1102 (2d Cir. 1995). Representations made by counsel or upon information and belief are insufficient. *Ruggiero*, 824 F. Supp. at 393.

Here, Parmar does not present an affidavit or other sworn statement from someone with personal knowledge about the relevant facts.  His motion should "fail on this ground alone."  *Id.* at 394.  Further, he fails to even allege facts that, if true, would entitle him to relief (*i.e.*, that the Government actually directed or participated in the alleged "theft" of the emails at issue).  His motion is a fishing expedition, and the Court should reject it without further proceedings.

Parmar is not entitled to an evidentiary hearing.

### D.    There is No Basis to Disqualify the Current Prosecution Team.

In addition to seeking suppression of an undefined universe of emails, Parmar seeks disqualification of the prosecution team, claiming that it has been "irredeemably tainted" because the Government has had "access" to emails on the Constellation Domain which, according to him, contain attorney client communications "involving multiple attorneys and matters having nothing to do with Company A[.]"  (Parmar Br. at 16).  These arguments have no merit.

While Parmar repeatedly claims the Government has had "access" to his privileged communications, his motion fails to specifically identify a single document the Government obtained from the Private Investment Firm or Company A that is subject to his attorney-client privilege.  Nor does he actually allege that the Government is in possession of such materials, as opposed to simply having "access" to them.  Parmar has had the documents the Government received from the Private Investment Firm and Company A for several years since the Government's initial discovery productions in this case.  Yet he has not once identified a specific document

from those productions that he claims is covered by his own personal privilege, other than vaguely alleging in other litigations that emails the Government has relied on in its criminal prosecution and civil forfeiture action are privileged.

Parmar's failure to raise document-specific privilege concerns with the Government in this case is telling given that the parties have addressed privilege issues in numerous contexts. For example, the Government, through a filter attorney, worked extensively with counsel to both Parmar and Bakhshi to identify and segregate from the prosecution team's access certain materials from Bakhshi's email account, and from Parmar's cell phone (which law enforcement seized at the time of his arrest), pending a privilege review by counsel.[34]

If Parmar had a legitimate, good faith basis to believe that the Government had obtained communications that were protected by his attorney-client privilege, there is no reason to believe he would not have identified those documents to the Government (or the Court) earlier in the case. Instead, Parmar's privilege claims appear to be another attempt to distract the Court from the merits of the case through a baseless motion. The Court should reject these efforts.

---

[34] The Government also has conferred with Company A concerning communications it produced to the Government that could be subject to its attorney-client privilege. Specifically, Company A's counsel advised the Government that it was waiving any applicable privileges with respect to communications it produced between representatives of Company A and its former outside counsel in connection with the Go-Private Transaction. Likewise, the Government's filter attorney conferred with Company A's counsel concerning documents Google produced in connection with the Bakhshi Email Account that could be subject to Company A's privilege.

## VIII. THE COURT SHOULD DENY PARMAR'S MOTIONS TO DISMISS UNDER THE DUE PROCESS CLAUSE AND THE COURT'S SUPERVISORY AUTHORITY BECAUSE HIS MISCONDUCT ALLEGATIONS ARE MERITLESS.

Parmar asks the Court to dismiss the indictment based on many of the same unsupported and speculative allegations of government misconduct alleged elsewhere in his motions.  He seeks the extreme sanction of dismissal under both the Due Process Clause and the Court's supervisory authority.  Even under Parmar's far-fetched theories of misconduct, this case would not present the egregious and rare circumstances required to warrant dismissal of the indictment.  Courts routinely deny motions like these and this Court should do the same.

### A.   Parmar Cannot Demonstrate Outrageous Government Misconduct.

Although the defense of outrageous government conduct is "often invoked by defendants, [it] is rarely applied by courts." *Voigt*, 89 F.3d at 1065.  The Third Circuit has "repeatedly" noted that it is "extremely hesitant to find law enforcement conduct so offensive that it violates the Due Process Clause." *United States v. Christie*, 624 F.3d 558, 572–73 (3d Cir. 2010).  "For the defense to apply, the Government's conduct must have rendered the prosecution of the defendant fundamentally unfair." *United States v. Lakhani*, 480 F.3d 171, 181 (3d Cir. 2007).  Thus, a court should not dismiss an indictment "each time the government acts deceptively or participates in a crime that it is investigating." *United States v. Nolan-Cooper*, 155 F.3d 221, 231 (3d Cir. 1998) (quotation marks omitted).  Instead, "the challenged conduct must be shocking, outrageous, and clearly intolerable." *United States v. Barbosa*, 271 F.3d 438, 469 (3d Cir. 2001).

93

As the Third Circuit has recognized, "the viability of the doctrine is hanging by a thread" and it may be "'moribund'" because, "in practice, courts have rejected its application with almost monotonous regularity." *Nolan-Cooper*, 155 F.3d at 230 (quotation marks omitted). Indeed, in over 40 years, the Third Circuit has found "government action" to be "so outrageous as to violate defendants' due process rights" only twice: "in *United States v. West*, 511 F.2d 1083 (3d Cir. 1975), and *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978)." *United States v. Driscoll*, 852 F.2d 84, 86 (3d Cir. 1988).

On *every* other occasion, the Third Circuit has rejected the claim. *E.g.*, *United States v. Fattah*, 858 F.3d 801, 812-13 (3d Cir. 2017); *Hoffecker*, 530 F.3d at 152–56; *Voigt*, 89 F.3d at 1063–70; *United States v. Gonzales*, 927 F.2d 139, 142–45 (3d Cir. 1991); *United States v. Gambino*, 788 F.2d 938, 945 n. 6 (3d Cir. 1986). No wonder: even if *West* and *Twigg* remain good law, *see United States v. Beverly*, 723 F.2d 11, 12 (3d Cir. 1983) (per curiam); *United States v. Jannotti*, 673 F.2d 578, 610 n. 17 (3d Cir. 1982) (en banc), they presented extraordinary circumstances.

In *West*, the Third Circuit "found that the government's conduct in having its agent suggest a narcotics sale to the defendant, providing the source of supply for the drug, and arranging for its sale to another agent, although the defendant had no 'prior inclination to engage in this evil business,' had 'passed the point of toleration.'" *Driscoll*, 852 F.2d at 86 (quoting *West*, 511 F.2d at 1086, 1085). And in *Twigg*, "the government suggested that defendant join in establishing a methamphetamine laboratory and then supplied him with essential materials, equipment, technical

94

expertise, and a site." *Driscoll*, 852 F.2d at 86.  Judging "this conduct in light of the fact that at the time the defendant 'was lawfully and peacefully minding his own affairs,'" the Third Circuit "concluded that 'fundamental fairness'" barred the prosecution.  *Id.* (quoting *Twigg*, 588 F.2d at 381).

That is not this case.  Indeed, even if Parmar's allegations were accepted at face value (which they should not be), they do not remotely approach the kind of conduct that has been found *not* to be outrageous government conduct.  *See, e.g.*, *Lakhani*, 480 F.3d at 182 (no outrageous government conduct where government agent initiated illicit arms deal, and government was both buyer and seller of the arms); *Nolan-Cooper*, 155 F.3d at 224 (no outrageous government conduct where government agent wined, dined and had sex with target); *Beverly*, 723 F.2d at 11–13 (no outrageous government conduct where informant solicited defendants to burn down government-owned building, and government agent purchased gasoline, gasoline can and disguises for defendants and drove them to the building).  It certainly does not match the "quite egregious" government "overinvolvement" in *Twigg*. *Nolan-Cooper*, 155 F.3d at 230.  In short, nothing Parmar alleges could properly be described as "outrageous."

Specifically, Parmar's misconduct claims are based on his allegations that the Government: brought this case in reliance on emails it knew a private entity previously had stolen from Parmar (Parmar Br. at 29-32); demonstrated "marked disinterest in either investigating any potential deficiencies in its evidence or confronting the sometimes inconsistent and sometimes actively illegal actions of the

purported victim," (*Id.* at 33); failed to respond to allegations of illegal conduct by one of the victims of the fraud (*Id.* at 35); and failed to present exculpatory information to the grand jury (namely, information regarding the value of Company A) (*Id.* at 36-38).

The Government already has addressed why Parmar's claims regarding the grand jury presentation and the allegedly stolen emails are speculative and meritless. But even if accepted as true, failing to present potentially exculpatory information to the grand jury or using emails that the government obtained through lawful process (even if the custodian did not have authority to collect those emails) does not come close to the extreme and egregious conduct courts have required before finding a due process violation.

Likewise, Parmar does not know what steps the Government did or did not take to review information he provided about purported illegal conduct by others. Like with all leads and tips, the Government exercises its discretion in determining whether to pursue investigative steps or take other action. That the Government has not brought charges against individuals Parmar self-servingly says committed crimes does not amount to Government misconduct.[35]

Nor does Parmar's allegation that the Government "deliberately withheld from the Court and the defense" during Parmar's bail hearings evidence that the Department of Justice had contacted one of the lenders for the Go-Private

---

[35] Parmar made the same general allegations about illegal conduct by third parties, including surveillance and threats, in his Civil RICO Case. The Court dismissed with prejudice those RICO claims. *See* Civ. No. 18-14322, Doc. No. 107, at 16-19, 21.

Transaction before it closed.  (Parmar Br. at 33-34).   According to Parmar, this information undermined the strength of the Government's evidence and supports his theory that the victims knew about the fraud but proceeded with the transaction nonetheless.  (*Id.*).  This is a red herring.  As a threshold matter, the Government is not required to disclose all of its evidence during bail hearings, which are "typically informal affairs, not substitutes for trial or discovery" and are not to be "a full-fledged trial or defendant's discovery expedition."  *United States v. Acevedo–Ramos,* 755 F.2d 203, 206 (1st Cir. 1985).

Even if the lender had knowledge of the Government's suspicion or concern about the Go-Private Transaction, such evidence would not exonerate Parmar given the numerous layers of material misrepresentations and omissions he made to the Lenders, the Private Investment Firm, and others.[36]   And while the Court did not have this specific piece of information (which has been disclosed to Parmar in discovery), the defense argued extensively that the victims could not have been defrauded because they were on notice of the scheme.  *See* Transcript of Bail Hearing, Doc. No. 18, at 36-38.  Finally, the Court detained Parmar based on risk of flight; it is unlikely that the isolated piece of evidence Parmar emphasizes would have

---

[36] As Parmar is aware from interview reports produced in discovery, the Government spoke with two individuals from the lender's compliance group in 2017, before the Go-Private Transaction closed.  In late 2018, prior to indictment, the Government interviewed a different representative from the lender who worked on the deal team, and that person stated that he had no knowledge of the Government's outreach to the lender in 2017.  Accordingly, the evidence suggests that the lender's employees who actually worked on the Go-Private Transaction were not aware of the Government's concerns in 2017.

impacted the flight risk analysis. Simply put, there is no evidence that the Government acted in bad faith or attempted to mislead the Court in any way.

Parmar has not, and cannot, demonstrate outrageous government misconduct.

**B.  Parmar is Not Entitled to Dismissal Under the Court's Supervisory Authority.**

Parmar also asks the Court to dismiss the indictment using its general supervisory authority over the proceedings. He relies on the same unsupported allegations of misconduct here as with his due process claim.

A court may dismiss an indictment based upon its inherent authority only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice. *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019). *See also Bank of Nova Scotia*, 487 U.S. at 254-56. As Parmar acknowledges, "to merit the ultimate sanction of dismissal," a defendant must establish willful government misconduct and prejudice, "the same standard applicable to dismissal for a *Brady* violation." *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 259 (3d Cir. 2005).

Parmar cannot satisfy either prong. For the reasons stated above, he cannot demonstrate any government misconduct, let alone the willful and egregious kind required to justify the "ultimate sanction of dismissal." *Id.* And the only prejudice he alleges is that the indictment would not have been returned had the Government presented the case to the grand jury the way he sees it. But that is not the standard, and Parmar has not cited any authority suggesting otherwise. The Court should deny Parmar's motion.

## IX.    PARMAR'S UNTIMELY AND REDUNDANT MOTION FOR DISQUALIFICATION IS FRIVOLOUS.

More than three weeks after defense motions were due pursuant to the Court's March 8, 2021 order (Doc. No. 103), without seeking leave from the Court or conferring with the Government, Parmar filed a new 21-page brief seeking recusal of the current prosecution team.

This motion recycles the same meritless allegations of government misconduct as his prior brief, and even attaches the same exhibits with the exception of one new one (a self-serving letter Parmar's counsel conveniently sent the Government shortly before filing motions that alleges that Parmar had again been threatened and harassed–those same allegations resurface in the "new" brief with counsel's letter submitted as evidence of the threats).  What has become clear is that Parmar is doubling down on his "put the government on trial" and "blame the victim" litigation strategy and, apparently, he thinks that if he says, "government misconduct" and adjectives like "shockingly" and "stunningly" enough times, someone will believe it. For all of the reasons already set forth above, the Court should see through this gamesmanship and swiftly reject these baseless and frivolous allegations.

## X.    PARMAR'S MOTION TO DISMISS THE FORFEITURE ALLEGATION SHOULD BE DENIED.

The indictment provides notice to Parmar that "as a result of committing the offenses constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), as alleged in Counts 1 through 3 of this Indictment," Parmar and his co-defendants shall forfeit "pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all

property, real and personal, that constitutes or is derived from proceeds traceable to the commission of" the offenses charged in the indictment.  Doc. No. 32 at 13 (emphasis added).  The forfeiture allegation then lists four real properties and six bank accounts that are subject to forfeiture upon Parmar's conviction of the charged offenses.[37]  Parmar seeks pre-trial dismissal of this forfeiture allegation, arguing, among other things, that the indictment does not provide justification for the government's restraint of various assets that Parmar alleges "did not originate with any of the defendants and were not part of the Go Private Transaction or . . . part of any asset deriving from Company A."  (Parmar Br. at 51).  Parmar further contends that the forfeiture allegations must be stricken from the indictment. Parmar Br. at 51.  Parmar also argues that any funds "originating from a non-party, non-witness, non-actor in the alleged events such as Anil Sharma," have been "improperly" seized and must be "unfrozen and immediately released."  (Parmar Br. at 51).  These arguments are wrong.

### A.    Parmar's Motion to Dismiss the Forfeiture Allegation Finds No Support in the Case Law.

The Government's forfeiture allegation is not a substantive count in the indictment and not the proper subject of a pre-trial motion to dismiss.  Federal Rule of Criminal Procedure 32.2(a) simply requires the Government to provide "notice to

---

[37]  The United States is not pursuing the forfeiture of two of the real properties originally listed in the indictment—the property in Colts Neck and the property at 2 River Terrace in New York. The United States has filed a bill of particulars providing notice that it does not intend to seek the criminal forfeiture.  Contrary to Parmar's contention that the two properties are not traceable to the charged fraud, the United States is not pursuing their forfeiture due to concerns regarding their value.

the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute." *See United States v. Dolney*, Crim. No. 04-159, 2005 WL 1076269, at *4 (E.D.N.Y. May 3, 2005) (if the Government wishes to seek forfeiture, it must necessarily include forfeiture allegations in the indictment); *United States v. Faux*, Crim. No. 14–28, 2015 WL 1190105, at *4 (D. Conn. Mar. 16, 2015) (the forfeiture allegation in the indictment is only a notice, and is not subject to a motion to dismiss for lack of evidence as forfeitability will be determined only if the defendant is convicted).

By meeting that notice requirement, the Government has not provided Parmar with a basis to engage in an intensive pre-trial inquiry to test the forfeiture allegation. Parmar does not cite a single case that supports that result. Multiple cases hold that pretrial motions to dismiss an indictment's forfeiture allegation are premature. *See, e.g., United States v. Dote*, 150 F. Supp. 2d 935, 943 (N.D. Ill. 2001) (forfeiture is a matter for the government to prove and the jury to determine at trial and is not an issue the court can resolve on a pre-trial motion to dismiss a forfeiture allegation); *see also United States v. Reese*, Crim. No.11-2294, 2012 WL 13080257, at *3 (D.N.M. Jun. 8, 2012) (defendant's pre-trial motion to dismiss a forfeiture allegation was premature); *United States v. Impastato*, Crim. No. 05-325, 2008 WL 373698, at *1 (E.D. La. Feb. 7, 2008) (same); *United States v. Afremov*, Crim. No. 06–196, 2007 WL 3237630, at *27-28 (D. Minn. Oct. 30, 2007) (same); *United States v. Chan*, Crim. No. 96-350, 2006 WL 224389, at *3 (E.D. Cal. Jan. 27, 2006) (same).

The reasoning of all of these cases is applicable here and the Court should deny the motion on this basis alone.

### B.   Parmar's Claim that the Bank Accounts Seized Pursuant to Seizure Warrants Should be Released is Meritless.

Citing no law, Parmar argues that the bank accounts listed in the forfeiture allegation of the indictment should be released.  The bank accounts named in the forfeiture allegation in the indictment were seized pursuant to seizure warrants issued on June 27, 2018 by the Honorable Cathy L. Waldor, U.S.M.J.  Judge Waldor issued the seizure warrants after finding probable cause that the accounts contained proceeds of the conspiracy to commit securities fraud charged in the criminal complaint. There is no reason to believe the magistrate judge erred in finding that the bank accounts listed in the indictment were criminal proceeds traceable to the charged fraud scheme.  Further, Parmar has not shown that there is a bona fide reason to believe that the magistrate judge erred in finding probable cause to believe the accounts are subject to forfeiture. *United States v. Dupree*, 795 F. Supp. 2d 115, 142-43 (E.D.N.Y. 2011) (denying post-seizure probable cause hearing because defendant failed to satisfy the second Jones-Farmer requirement by making a prima facie showing that the seizure lacked probable cause).  By arguing that the Court must release any funds that do "not originate with any of the defendants and were not part of the Go Private Transaction or, indeed, part of any asset deriving from Company A," Doc. No. 107-1 at 51, Parmar asks the Court to rely on his own self-serving statements in order to contravene a court order—the seizure warrant issued by Judge Waldor.  No case law supports such a result.

102

As discussed above, to the extent that Parmar argues that the forfeiture allegations in the indictment are somehow deficient because they do not provide a justification for seizing the bank accounts listed in the indictment, he misunderstands the purpose of the indictment's forfeiture allegations.  The case law is clear that the nexus between the specific property named in the indictment's forfeiture allegation and the offense charged in the indictment need not be alleged in the indictment.  *See United States v. Miller*, 645 Fed. Appx. 211 (3rd Cir. 2016) (defendant is entitled only to notice that his property was subject to forfeiture); *United States v. Palfrey*, 499 F. Supp. 2d 34, 48-49 (D.D.C. 2007) (it is "manifestly illogical" to require the indictment to allege the factual nexus between the property and the offense).  Parmar's argument that the forfeiture allegations should be dismissed because they do not explain the connection between the specific property named in the indictment and the offenses charged in the indictment is meritless.

### C.   The Forfeiture Statutes Allow the Government to Restrain Property Held in the Names of Third Parties Other than Parmar.

As discussed above, the forfeiture allegation in the indictment lists, inter alia, six bank accounts all held in the names of various corporate entities.  Though Parmar argues that the United States may not restrain assets held by third parties other than himself or his co-defendants, he is mistaken.  As a threshold matter, property representing criminal proceeds that have been transferred to third parties other than the defendant may be forfeited through the criminal case against the defendant because the Government's interest in property that is criminal proceeds vests at the time of the offense giving rise to the forfeiture.  *United States v. Lazarenko*, 476 F.3d

642, 647 (9th Cir. 2007) (under the relation back doctrine, the Government's interest in the property vests at the time the defendant commits the crime; "otherwise, a defendant could attempt to avoid criminal forfeiture by transferring his property to another party before conviction"); *United States v. Close*, 755 Fed. Appx. 626 (9th Cir. 2019) (the Government's interest in fraud proceeds – and in property traceable to such proceeds – relates back to the onset of the fraud); *United States v. Gilbert*, 244 F.3d 888, 902 n. 38 (11th Cir. 2001) (under the relation back doctrine, Government's interest dates back to the time of the act that made the property subject to forfeiture; Congress included the provision to prevent a defendant from attempting to transfer his property to a third party prior to his conviction; third party who objects to application of the relation back doctrine must file a claim in the ancillary proceeding).

Following the relation back doctrine, and contrary to Parmar's arguments, property held by third parties may be restrained to preserve the Government's interest in that property. *See United States v. Park*, 825 F. Supp. 2d 644, 647 (D. Md. 2011) ([p]roperty in which a third party has an interest may be subject to pre-trial restraint so that the Government's forfeitable interest in the property may be preserved") (collecting cases); *United States v. Kolfage*, Crim. No. 20-412, 2020 WL 7342796 (S.D.N.Y. Dec. 14, 2020) (restraining the assets of the crowdfunding entity from which defendants allegedly diverted funds for their personal use).  Here, the court found probable cause that the accounts listed in the indictment contained proceeds of the charged fraud scheme.  As such, the six seized accounts held in the names of third parties are properly listed in the indictment's forfeiture allegation.

Thus, Parmar's argument that the government may not forfeit accounts held by parties other than himself and his co-defendants is baseless.

Not only may the government restrain property held by third parties in order to secure the property's availability for forfeiture, but a defendant has no standing to object to court-ordered restraints on property subject to forfeiture on the ground that the property belongs to a third party. *United States v. Phillips*, 434 F.3d 913, 916 (7th Cir. 2005) (defendant lacked standing to object to restraining order on ground that property belonged to her husband); *United States v. Miller*, 26 F. Supp. 2d 415, 432 (N.D.N.Y. 1998) (defendant lacks standing to object to pretrial restraining order on ground that property belongs to third party); *United States v. Morrison*, Crim. No. 04-699, 2006 WL 2990481, *6 (E.D.N.Y. Oct. 19, 2006) (defendant cannot object to pretrial restraining order on the ground that the property belongs to his wife). Here, none of the six accounts listed in the forfeiture allegations in the indictment are held in Parmar's name. Therefore, Parmar has no standing to object to their forfeiture on the ground that they are held in the name of third parties.

The third-party accountholders of the accounts listed in indictment have a remedy to recover their alleged interest in forfeited property. If any of the corporations that are the accountholders for the accounts listed in the indictment seek to challenge the forfeiture of the accounts, the procedure by which they may seek to recover an alleged interest in forfeited property is through a post-trial ancillary proceeding. *See* 21 U.S.C. § 853(n); *United States v. Bennett,* 252 F.3d 559, 563 (2d Cir. 2001) (the procedure for recovering criminal proceeds transferred by a defendant

to a third party is codified at §§ 853(c) and (n)(6)(B); the Government forfeits the property in the criminal case, subject to the third party's right to contest the forfeiture in the ancillary proceeding).

## CONCLUSION

For the reasons stated above, the Court should deny the defendants' motions in their entirety.


Respectfully submitted,

RACHAEL A. HONIG
Acting United States Attorney


By:  *s/Nicholas P. Grippo*
NICHOLAS P. GRIPPO
HEATHER SUCHORSKY
SARAH DEVLIN
Assistant United States Attorneys

LESLIE E. LEHNERT
Trial Attorney
Money Laundering & Asset Recovery Section
Department of Justice


Dated: Newark, New Jersey
        May 13, 2021